**No. 26-7139**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

CALIFORNIA NURSES ASSOCIATION, *et al.*,
Plaintiffs-Appellees,

v.

MARKWAYNE MULLIN, *et al.*,
Defendants-Appellants.

On Appeal from the United States District Court for the Northern District of California

# EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR IMMEDIATE ADMINISTRATIVE STAY AND STAY PENDING APPEAL

**RELIEF REQUESTED ON OR BEFORE OCTOBER 29, 2026**

BRETT A. SHUMATE
*Assistant Attorney General*

CRAIG H. MISSAKIAN
*United States Attorney*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
GABRIEL I. SCHONFELD
*Attorneys, Appellate Staff*
*Civil Division, Room 7219*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3306*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 16. Circuit Rule 27-3 Certificate for Emergency Motion

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form16instructions.pdf*

**9th Cir. Case Number(s)** 26-7139

**Case Name** California Nurses Association et al. v. Markwayne Mullin et al.

I certify the following:

The relief I request in the emergency motion that accompanies this certificate is:

1) An immediate administrative stay of the district court's preliminary injunction issued October 21, 2026.

2) On or before October 29, 2026, a stay pending appeal of the same order.

Relief is needed no later than *(date)*: October 29, 2026

The following will happen if relief is not granted within the requested time:

The preliminary injunction will continue to interfere with ongoing federal law enforcement operations relevant to the security and integrity of the midterm elections to be held on November 3, 2026.

I could not have filed this motion earlier because:

The preliminary injunction was issued on October 21, 2026. The government prepared this appeal and stay motion as quickly as possible, within six days of the injunction being issued.

I requested this relief in the district court or other lower court: ◉ Yes ○ No

If not, why not:

I notified 9th Circuit court staff via voicemail or email about the filing of this motion: ◉ Yes ○ No

If not, why not:

I have notified all counsel and any unrepresented party of the filing of this motion:

On *(date)*: October 27, 2026

By *(method)*: ECF and email

Position of other parties: Oppose

Name and best contact information for each counsel/party notified:

See list of counsel on following pages.

I declare under penalty of perjury that the foregoing is true.

**Signature** /s/ Gabriel I. Schonfeld **Date** 10/27/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

## LIST OF COUNSEL NOTIFIED

**California Nurses Association**
**National Nurses United**
**Voto Latino Foundation**

Beau Tremitiere
beau.tremitiere@protectdemocracy.org
202-579-4582

Geoffrey Curfman
geoffrey.curfman@protectdemocracy.org
202-843-3956

Ashley R. Fox
ashley.fox@protectdemocracy.org
202-819-1639

Jessica Ann Marsden
jess.marsden@protectdemocracy.org
202-579-4582

Zachary Taylor West
zachary.west@protectdemocracy.org
202-579-4582

Hayden Johnson
hayden.johnson@protectdemocracy.org
202-870-3210

Benjamin Rush Farley
farley@nilc.org
603-320-5598

Imani Renee Franklin
franklin@nilc.org
678-637-9967

**County of Santa Clara**

Kavita Kandala Narayan
kavita.narayan@cco.sccgov.org
408-299-5900

Meredith Anne Johnson
meredith.johnson@cco.sccgov.org
408-299-5900

Anthony J. LoPresti
tony.lopresti@cco.sccgov.org
408-299-6935

Bill Nguyen
bill.nguyen@cco.sccgov.org
669-279-9957

Jessica Ann Marsden
(see above)

Beau Tremitiere
(see above)

**City and County of San Francisco**

Michael A. Keough
michael.keough@sfcityatty.org
415-544-3959

Mollie M. Lee
mollie.lee@sfcityatty.org
415-554-4260

David S. Chiu
cityattorney@sfcityatty.org
415-554-4700

Sara Jennifer Eisenberg
sara.eisenberg@sfcityatty.org
415-554-3800

Yvonne Rsil Mere
yvonne.mere@sfcityatty.org
415-554-3874

Joel F. Wacks
joel.wacks@sfcityatty.org
415-268-7000

Beau Tremitiere
(see above)

Jessica Ann Marsden
(see above)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

STATEMENT ........ 3

A. Statutory Background ........ 3

B. Factual Background ........ 5

C. Prior Proceedings ........ 8

ARGUMENT ........ 12

I. CNA Lacks Associational Standing ........ 12

II. Plaintiffs' Voting Rights Act Claim Fails on the Merits ........ 17

III. The Preliminary Injunction is Impermissibly Vague and Improperly Intrudes on the Executive Branch's Enforcement of Federal Election Law. ........ 21

IV. The Remaining Stay Factors Decisively Favor the Government ........ 23

CONCLUSION ........ 26

CERTIFICATE OF COMPLIANCE

## INTRODUCTION

The district court has issued a vague and unadministrable preliminary injunction with the purpose and effect of making it more difficult for the government to conduct investigations of suspected ineligible voters immediately before a federal election. The government respectfully requests a stay of that order pending appeal. Given the imminence of the election, we request an immediate administrative stay pending resolution of this motion, and request a ruling on the motion no later than Thursday, October 29. To facilitate this Court's expeditious review of this motion, we waive our right to file a reply in support of this motion.

The U.S. Department of Homeland Security (DHS) is actively working to enforce the federal statutes that bar noncitizens from voting or registering to vote in federal elections. Working from the best information lawfully available, DHS compares immigration and voting records to preliminarily identify persons who may have registered or voted illegally. Some of those leads are sent to Homeland Security Investigations field offices for further investigation, and some of those investigations result in a field interview to confirm that the subject is in

fact a noncitizen. DHS recognizes that this process involves a risk of mistake regarding an individual's identity or immigration status, and works at every step to exclude U.S. citizens from the subject population. DHS has actively sought to inform the public, via social media and other channels, about its efforts to protect the integrity of American elections.

The district court held that by investigating unlawful voters, DHS illegally intimidated persons who wish to mobilize and assist lawful ones. The court found that the government's investigative approach likely violates Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), and entered a preliminary injunction prohibiting DHS through the upcoming midterm elections from "[c]onducting elections-related field operations and field interviews" in nine states "that involve or are likely to involve persons whom [defendants] know, suspect, or should reasonably know or suspect are U.S. citizens." PI Op. 18, ECF No. 87.[1]

[1] Citations to "ECF No. __" refer to materials filed in the district court.

The district court was wrong multiple times over. Plaintiffs cannot claim standing to sue based on the remote possibility that they will be mistakenly identified as noncitizens and subject to a law-enforcement encounter as a result. And even if they had standing, their claims would still fail on the merits—Section 11(b) does not contain a private right of action, the government did not illegally intimidate plaintiffs because of their protected voter mobilization, and the preliminary injunction (which appears tailored to protect voters rather than persons who mobilize them) is in any event hopelessly vague and overreaching. The end result is that DHS may be substantially chilled in enforcing federal voting law in the runup to a nationwide election. This court should enter an immediate administrative stay and stay pending appeal.

## STATEMENT

### A. Statutory Background

**Federal Prohibitions on Noncitizen Voting.** Congress has enacted multiple statutes that bar noncitizens from voting or registering to vote in federal elections. Fraudulently claiming U.S. citizenship in order to vote or register is a felony. 18 U.S.C. § 1015(f). And simply voting in a federal election while a noncitizen is generally a

strict-liability misdemeanor. 18 U.S.C. § 611. In addition to these criminal penalties, noncitizens who illegally vote or register to vote also face significant civil immigration consequences. An alien who votes unlawfully, or who falsely represents himself as a U.S. citizen for voter-registration purposes, is generally inadmissible and removable as a matter of law. 8 U.S.C. §§ 1227(a)(3)(D), (a)(6), 1182(a)(6)(C)(ii), (a)(10)(D).[2]

**The Voting Rights Act.** Section 11(b) of the Voting Rights Act of 1965 provides in relevant part that "[n]o person, whether acting under color of law or otherwise, shall . . . intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b). The Act confers authority on the Attorney General to seek injunctions against any act prohibited by Section 11. *Id.* § 10308.

---

[2] Each cited provision contains a narrow exception for certain people who "reasonably believed" that they were citizens. 18 U.S.C. §§ 1015, 611(c); 8 U.S.C. §§ 1227(a)(3)(D)(ii), (a)(6)(B), 1182(a)(6)(c)(ii)(II), (a)(10)(D)(ii).

### B. Factual Background

**1.** The President has ordered the Executive Branch to protect the integrity of American elections by prioritizing the investigation and enforcement of federal laws that prohibit noncitizen voting. *Preserving and Protecting the Integrity of American Elections*, Exec. Order No. 14248 §§ 2(b)-(c), 2(e), 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025); *Ensuring Citizenship Verification and Integrity in Federal Elections*, Exec. Order No. 14399 § 5, 91 Fed. Reg. 17125, 17127 (Mar. 31, 2026). In furtherance of these directives, the U.S. Department of Homeland Security (DHS) has worked since March 2025 to identify and investigate instances of unlawful voting and voter registration by noncitizens. Declaration of Homeland Security Investigations (HSI Decl.) ¶ 10, ECF No. 46-2; Declaration of United States Citizenship and Immigration Services (USCIS Decl.) ¶ 9, ECF No. 46-1.

Two DHS components are primarily responsible for investigating noncitizen voting. At the threshold, United States Citizenship and Information Services (USCIS) identifies potential subjects of investigation by comparing federal immigration and naturalization records, along with relevant records available from commercial

databases, against records of voting and voter registration that are "voluntarily provided by state and local jurisdictions" or otherwise "lawfully available" to the agency. USCIS Decl. ¶¶ 8, 10.

"Throughout its analysis [USCIS] seeks to exclude any United States Citizens from further review." USCIS Decl. ¶ 10. The agency is aware, however, of "the possibility that in rare circumstances U.S. citizens might be incorrectly identified as aliens." USCIS Decl. ¶ 17. It has accordingly established "safeguards intended to reduce the risk" of such errors. *Id.* For example, before a case is referred for further investigation outside of USCIS, the agency "manually reviews authorized DHS records and other lawfully available information to verify the individual's identity and determine whether the available evidence sufficiently supports the referral." USCIS Decl. ¶ 19; HSI Decl. ¶ 12. Where USCIS cannot confirm noncitizenship status, it only makes a referral if "the data indicate that the person may have voted or registered to vote prior to naturalization." USCIS Decl. ¶ 19.

When USCIS determines based on its review that a case may warrant further investigation, it refers the matter to Homeland Security Investigations (HSI), a component of U.S. Immigration and

Customs Enforcement that is authorized to investigate unlawful noncitizen voting. HSI Decl. ¶¶ 7-8, 13; *see also Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. __, at 37-38 (May 12, 2026). In at least some cases, USCIS will also note its preliminary finding of unlawful voting or registration in a DHS system called TECS. *See* HSI Decl. ¶ 19-21.[3] TECS records are consulted "primarily . . . when a subject is encountered by DHS entities," such as at a border crossing. *Id.* ¶ 20.

HSI does not treat USCIS's referrals (or entries in TECS) as "establish[ing] criminal activity, voting ineligibility, or grounds for enforcement." HSI Decl. ¶¶ 13, 19-20. Nor do such referrals "direct a predetermined investigative outcome." *Id.* ¶ 9. Instead, referrals are reviewed in the first instance by a component of HSI headquarters, and are disseminated to HSI field offices as "investigative leads" only if headquarters determines that they "warrant further investigation." *Id.* ¶¶ 9-10, 18. HSI field offices, in turn, have broad discretion to decide whether and how to pursue each investigative lead. *See id.* ¶ 22.

---

[3] TECS at one time stood for "Treasury Enforcement Communication System," but is no longer used as an acronym.

**2.** Beginning September 1, 2026, HSI "launch[ed] a coordinated Criminal Voter Fraud surge initiative to pursue investigative leads, conduct field interviews, and support timely prosecutorial review." ECF No. 77-1 at AR-2-001. As part of this enforcement initiative, HSI field offices in certain "assigned states" were "asked to take investigative action" on particular dates. While this initiative has been ongoing, DHS has taken steps to inform the public that the agency is vigorously pursuing potential violations of federal laws against noncitizen voting and false claims of citizenship. PI Op. 4-5 (collecting examples).

**C. Prior Proceedings**

**1.** Plaintiffs are two labor unions, two local governments, and an advocacy organization focused on voter registration and turnout. *See generally* ECF No. 1 ¶¶ 20-48. They filed suit about two weeks into the challenged enforcement initiative. As relevant here, Plaintiffs asserted that DHS had violated Section 11(b) of the Voting Rights Act and sought a preliminary injunction against "elections-related field

operations and field interviews" involving U.S. citizens, ECF No. 10-8 at 3.[4]

**2.** The district court rejected many of plaintiffs' claims to standing but held that the two labor-union plaintiffs—the California Nurses Association and National Nurses United (collectively, CNA)—have standing to raise a claim for intimidation directed at voter mobilization and assistance, and entered a preliminary injunction. The district court first held that CNA has associational standing because (as relevant here) at least one of its U.S. citizen members has stopped engaging in election-related activities based on a fear of being erroneously "identified, surveilled, targeted, investigated, forced into coercive encounters with HSI, and detained" in connection with a DHS investigation into noncitizen voting. PI Op. 9. The district court did not find—and CNA did not claim—that any of CNA's U.S. citizen members have in fact experienced such harms.

Turning to the merits, the district court first held that CNA may sue the United States under Section 11(b) notwithstanding that

---

[4] Plaintiffs also asserted other claims, but the district court declined to grant preliminary relief on any of them. PI Op. 11.

provision's textual silence regarding private enforcement. PI Op. 12. It then concluded that DHS's investigations into federal election-law violations constitute unlawful intimidation (1) because those investigations are predicated in their initial stages on sources of information the district court regarded as "overbroad," "inaccurate," "flawed[,] and incomplete"; and (2) because DHS has used social media and other channels to inform the public that it is vigorously pursuing potential violations of federal law. PI Op. 14-15.

Finally, the district court determined that the remaining equitable factors support a preliminary injunction. It held that the government was inflicting irreparable harm to the extent it impeded activities protected by the Voting Rights Act because a lost chance to fairly participate in the political process cannot be restored after the fact. And it held that CNA and the public's interests in free and fair midterm elections outweigh the government's interest in an investigative approach that the district court regarded as a form of illegal intimidation. PI Op. 14-16.

**3.** The district court issued its preliminary injunction on October 21, 2026. That order applies in nine states: six named in the

administrative record as the focus of DHS's enforcement activities—California, Georgia, Missouri, Pennsylvania, Washington, and Wisconsin—and three more purportedly identified as such in media reports—Connecticut, New York, and Nevada. *See* PI Op. 2, 18; ECF No. 77-1 at AR-2-001. In those states, the preliminary injunction prohibits DHS from:

> a. Conducting elections-related field operations and field interviews . . . that involve or are likely to involve persons whom the [defendants] know, suspect, or should reasonably know or suspect are U.S. citizens; and
>
> b. Conducting elections-related field operations . . . based wholly on TECS records generated from the Voter Eligibility Matching Policy, as identified in this Order, against persons whom the [defendants] know, suspect, or should reasonably know or suspect are U.S. citizens.

PI Op. 18.

After a brief initial stay ordered by the district court *sua sponte*, the preliminary injunction took effect at 5:00pm on October 23, 2026. PI Op. 18. It will "remain in effect until November 3, 2026, at 8:00pm, or when polling places close on Election Day, or as otherwise directed by the Court." *Id.*

**4.** On October 26, 2026, the government filed a timely notice of appeal from the preliminary injunction. ECF No. 89. On October 27, it

moved the district court to stay that order pending review by this Court. ECF No. 90. The government requested that the district court rule "as quickly as possible" and noted the government's intent to move on the same day for a stay in this Court if the district court did not grant relief. *Id.* at 1:12-16. Plaintiffs have filed an opposition in district court, but the district court has not acted on the government's motion.

## ARGUMENT

The government is entitled to a stay of the preliminary injunction pending appeal because it is likely to succeed on the merits, because it will suffer irreparable harm absent a stay, and because the balance of the equities and public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009).

### I. CNA Lacks Associational Standing

Meeting Article III's minimum threshold for standing requires (among other things) that at least one plaintiff establish an injury in fact that is "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 381 (2024). Mere "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA,*

568 U.S. 398, 409 (2013) (quotation marks omitted). To obtain a preliminary injunction, there must be a "clear showing" that the plaintiff is likely to establish standing. *Arizona All. for Retired Ams. v. Mayes*, 186 F.4th 622, 631 (9th Cir. 2026) (en banc).

To establish associational standing, CNA must show that for at least one of its members, the challenged action threatens a cognizable injury in fact, such that the member "would otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The district court was mistaken to hold that this requirement was satisfied. *See* PI Op. 9-10.

Although CNA identifies four members from whom its standing purportedly derives, each one presents the same basic facts: The member is a naturalized citizen, ECF No. 10-1 ¶¶ 20, 30, 41; ECF No. 78-1 ¶ 16, who is generally "aware" that DHS is investigating persons it "believes are non-citizens" who have voted or registered to vote, ECF No. 10-1 ¶¶ 23, 32; ECF No. 78-1 ¶ 18; *see* ECF No. 10-1 ¶ 42. They fear that in the course of those investigations DHS might mistake them for a noncitizen. ECF No. 10-1 ¶¶ 24, 36, 44; *see* ECF No. 78-1 ¶ 19. They fear in turn that if DHS mistakes them for a noncitizen, then they

might be interviewed or detained. ECF No. 10-1 ¶¶ 24, 33, 44; ECF No. 78-1 ¶¶ 19-20. As a result of these fears, they have stopped engaging in election-related conduct such as attending political rallies, participating in campaign events, and serving as a poll monitor. ECF No. 10-1 ¶¶ 26, 37; ECF No. 78-1 ¶ 21.

But the Supreme Court has squarely held that a plaintiff's effort to avoid harm is not itself a basis for standing. *See Clapper*, 568 U.S. at 415-16. Instead, a plaintiff must demonstrate that but for efforts to avoid a harm, the challenged action threatens harm that is "certainly impending." *Id.*

CNA's allegations here fall far short of that threshold. Any harm to its members' asserted interests would arise from a "highly attenuated . . . chain of contingencies" that for any individual member as likely as not will never come to pass. *Clapper*, 568 U.S. at 410-11. CNA does not (and could not) claim that the government has a policy of questioning or detaining naturalized citizens based on that status (absent affirmative evidence of illegal voting or registration before naturalization). *See* USCIS Decl. ¶ 19. *Cf. Vasquez Perdomo v. Noem*, 148 F.4th 656, 674-76 (9th Cir. 2025) (per curiam) (holding that

allegedly unlawful law enforcement encounters were sufficiently imminent to support standing where they were "approv[ed] or authoriz[ed]" as "part of a pattern of officially sanctioned behavior" (quotation marks omitted)); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708-09 (9th Cir. 2025) (finding standing where law required county recorders to periodically review citizenship and make determinations that would automatically trigger process leading to cancellation of voter registration). Rather, CNA's naturalized members fear that they might be mistaken for noncitizens and encounter federal investigators as a result.

But an injury based on such a mistake could manifest (if at all) only following failures at multiple stages of DHS's "layered vetting process to filter out" U.S. citizens. HSI Decl. ¶ 12.[5] A naturalized citizen would need to (1) be the subject of an erroneous "initial system match" by USCIS, USCIS Decl. ¶ 18, which would need to (2) survive USCIS's

---

[5] As noted above, *see supra* pp. 6, 14, DHS policy permits investigation of naturalized U.S. citizens if there is affirmative evidence that they illegally voted or registered to vote prior to naturalization, USCIS Decl. ¶ 19. CNA's naturalized members do not assert that they have ever engaged in such conduct, or identify any reason DHS would likely suspect them of doing so. Nor do (or could) they assert that naturalized citizens are subject to field operations by default.

"manual review" for "acquired or derived U.S. citizenship," *id.* ¶ 19. USCIS would then need to (3) "determine [that] the available evidence sufficiently supports . . . referral" to HSI headquarters, *id.*, which in turn would need to (4) conclude that the matter should be "disseminated to . . . field offices" because it "warrant[s] further investigation," HSI Decl. ¶ 22. And even after such dissemination, no law-enforcement encounter would occur until the receiving field office (5) "determine[d]," based on "an independent review of the referral and available records" that "an appropriate investigative basis exists" and warrants "additional investigative activity" in light of the office's limited resources, *id.* ¶ 21-22.

DHS recognizes, and has designed its review process to minimize, the possibility that "in rare circumstances U.S. citizens might be incorrectly identified as aliens." USCIS Decl. ¶ 17. But it is "no more than conjecture to suggest" that such mistakes are the rule rather than the exception, and "surely no more than speculation to assert" that they will affect CNA's members in particular. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-08 (1983). "[A] theory of standing[] which relies on a highly attenuated chain of possibilities[] does not satisfy the

requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

## II. Plaintiffs' Voting Rights Act Claim Fails on the Merits

For two reasons, the government is also likely to prevail on the merits of plaintiffs' claim that DHS has "intimidate[d], threaten[ed] or coerce[d]" them "for urging or aiding" others to vote. *See* 52 U.S.C. § 10307(b). First, there is no private cause of action to enforce Section 11(b). And second, even if that provision were privately enforceable, the record still would not support a finding of intimidation based on voter mobilization or assistance.

**1.** "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but *also* a private remedy." *Id* (emphasis added). "Statutory intent on th[e] latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable . . . as a policy matter, or how compatible with the statute." *Id.* (citations omitted).

Section 11(b) does not contain an express private right of action, and nothing in that provision, or the rest of the Voting Rights Act, suggests that Congress intended to create one by implication. Indeed, the opposite is true. The Act provides expressly for enforcement of Section 11(b) by the Attorney General, 52 U.S.C. § 10308(d) (authorizing Attorney General to seek injunctions against "any act or practice prohibited by section . . . 10307"), and "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," *Sandoval*, 532 U.S. at 290.

Moreover, where Congress elsewhere enacted language recognizing that *some* provisions of the Voting Rights Act are privately enforceable by "an aggrieved person," it expressly cabined that recognition to "proceeding[s] instituted . . . under" statutes enacted "*to enforce the voting guarantees of the fourteenth or fifteenth amendment*." 52 U.S.C. § 10302 (emphasis added); *see also Morse v. Republican Party of Virginia*, 517 U.S. 186, 233-34 (1996) (holding that because a different section of the Act was "by its terms . . . designed for enforcement of the . . . Fourteenth and Fifteenth Amendments," Congress "must have intended it to provide private remedies"). But

Section 11(b)—which applies to private conduct as well as state action, and requires no showing of discriminatory or race-based intent—is manifestly not based on those provisions. *Gardner v. Jessup*, 2025 WL 4743403, at *6 (S.D. Ga. June 26, 2025), *vacated on other grounds* 2026 WL 3089236 (S.D. Ga. June 29, 2026); *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1351 (N.D. Ga. 2023). Rather, it is based on Congress' authority to "make or alter . . . Regulations" governing federal elections. U.S. Const. art. I, § 4, cl 1; H.R. Rep. 89-439 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462. The district court provided no meaningful analysis of these precedents, instead simply following non-binding cases that have misapplied them. PI Op. 12 (citing *Michigan Welfare Rights Org. v. Trump*, 600 F. Supp. 3d 85, 104-06 (D.D.C. 2022)).

**2.** Even if Section 11(b) were privately enforceable, plaintiffs still would have no likelihood of success. By its plain terms, Section 11(b) does not reach every action that incidentally or inadvertently discourages someone from lawfully "urging or aiding" another person to vote. Rather, it prohibits only intimidating, threatening, or coercing a person "for" engaging in protected voter mobilization and assistance. 52 U.S.C. § 10307(b). In other words, intimidation can violate Section 11(b)

only if it is "'because of,' 'on account of,' or 'in consequence of'" the alleged victim's protected activities. *For*, Black's Law Dictionary (1968 ed.).

There is no likelihood that plaintiffs can make the necessary showing here, where the record shows at most that DHS has vigorously pursued potential violations of valid federal election laws. *See supra* pp. 5-8. The district court apparently found unlawful intimidation based on the fact that DHS begins its investigations into noncitizen voting on the basis of incomplete information, and on the agency's efforts to inform the public about its enforcement activities. PI Op. 14-15. But those facts are banal, not suspicious, and there is no reason to believe that in enacting Section 11(b) Congress meant to require federal law enforcement to investigate only those election crimes that require no further investigation, and to do so essentially in secret. The bare fact that the government is, by historical standards, pursuing *illegal* noncitizen voting with "unusual . . . exertion," and that its preliminary suspicions will sometimes prove "factually unfounded," does not support an inference that these investigations are being carried out on account of *lawful* electoral conduct. *See United States v. Holmes County*, 385

F.2d 145, 149 (5th Cir. 1967). And neither the district court's reasoning nor its injunction related to any effort to impede voter mobilization or assistance; instead, the district court focused on the government's effort to target unlawful voting by noncitizens, which is not addressed by Section 11(b). *See also* PI Op. 9-10 (holding that plaintiffs lack standing to assert that they were intimidated for voting rather than for mobilizing or assisting others).

## III. The Preliminary Injunction is Impermissibly Vague and Improperly Intrudes on the Executive Branch's Enforcement of Federal Election Law.

The government is also entitled to a stay because the preliminary injunction is unenforceably vague and improperly seeks to superintend the details of DHS's investigative processes.

Federal Rule of Civil Procedure 65 requires injunctions to be "specific in terms" and to "describe in reasonable detail . . . the act or acts sought to be restrained." Fed. R. Civ. P. 65(d)(1). An injunction violates Rule 65's specificity provisions if it is "so vague that it has no reasonably specific meaning." *Vasquez Perdomo*, 148 F.4th at 679 (quotation marks omitted).

The preliminary injunction does not come close to satisfying this basic requirement. The government could be sanctioned for acting with a degree of constructive suspicion so attenuated that it could not be fairly assessed except in hindsight. To know whether conducting a planned field operation would amount to contempt, investigators would have to know whether (1) it is *likely* that the operation (2) *will* in the future (3) *involve* (to an unspecified degree) persons (potentially unknown) who the government (4) *should* (5) *suspect* are U.S. citizens. PI Op. 18. That is inscrutable. An injunction with which compliance can be determined only in retrospect does not provide the fair notice that Rule 65 requires. *Cf. Vasquez Perdomo*, 148 F.4th at 680 (injunction satisfied Rule 65 where government could avoid contempt by not making decision based on factors forbidden by the order's plain terms, "even if a court later conclude[d]" that the bottom-line decision was wrong).

That vagueness is all the more impermissible under the circumstances of this case, where the gist of the injunction is that the government may not take otherwise-lawful steps to investigate potential federal crimes if the district court thinks its initial suspicions

are ill-founded. But "the investigation of crime is primarily an executive function" and "a district court has no general supervisory jurisdiction over the course of executive investigations." *Jett v. Castaneda*, 578 F.2d 842, 845 (9th Cir. 1978). The district court abused its discretion by entering an injunction that purports to dictate the quantum of evidence the Executive Branch must possess before it can fulfill the core executive role of conducting a criminal investigation.

## IV. The Remaining Stay Factors Decisively Favor the Government

The Court should stay the preliminary injunction because the government and public interest will be irreparably injured absent a stay. The district court effectively seeks to oversee DHS's efforts to determine whether preliminary evidence of noncitizen voting warrants further investigation. By itself, that violation of the separation of powers constitutes an irreparable harm to the Executive Branch. *See Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025).

That harm is further compounded by the order's remarkable vagueness. So long as the preliminary injunction stands, HSI special agents will be unable to determine which field operations will expose them to the threat of contempt. Special agents "may now fear, given the

language of the preliminary injunction, that their actions—designed to remove U.S. citizens from suspicion of a criminal violation—may be in contempt of the court's order." Declaration of James C. Harris ¶ 12, ECF No. 90-1. That fear and ambiguity "adds confusion and hampers a special agent's ability to act decisively" in investigating unlawful voting. *Id.* As a result, "HSI agents may be deterred from performing their law enforcement functions." *Id.* ¶ 10. The district court's injunction thus threatens to insulate individuals who cannot be "conclusively verif[ied]" as aliens from lawful questioning and inquiry into the integrity of the voting system. *Id.*

The harm to the government from such a chill would be significant. "[I]n-person interview[s]" are "integral" to "nearly all voter fraud investigations" as a way to "ensure that DHS is investigating noncitizen voters." Harris Decl. ¶ 11. In cases where HSI is chilled from conducting interviews based on the preliminary injunction, it would be "very difficult . . . to establish probable cause." *Id.*

Under any circumstances, this would constitute irreparable harm. *Tincher v. Noem*, 164 F.4th 1097, 1100 (8th Cir. 2026) (per curiam) ("Most critically, to the extent the injunction's breadth and vagueness

cause federal agents to hesitate in performing their lawful duties, it threatens to irreparably harm the government and undermine the public interest." (citation modified)). The harm is only magnified by the rapidly approaching midterm elections. "Hampering DHS's ability to interview suspected unlawful voters for fear of inadvertently encountering U.S. citizens will effectively lessen the chances that DHS will be able to identify and arrest an alien who would have voted in a national election on November 3, 2026." Harris Decl. ¶ 13.

By contrast, plaintiffs fail to establish even standing to sue, much less a valid claim under the Voting Rights Act. The remote possibility that CNA's naturalized citizen members will be interviewed by law enforcement in order to confirm that they are *not* noncitizens is far too little harm to warrant disruption of a crucial initiative to enforce the federal election laws just days before a nationwide election. The mismatch between the claimed harms to voter-mobilization efforts and the preliminary injunction relating to investigations into potential voters themselves highlights the degree to which the injunction fails to redress any imminent irreparable harm. Accordingly, both the equities and the public interest decisively favor a stay pending appeal.

## CONCLUSION

The Court should enter an immediate administrative stay and stay the preliminary injunction pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

CRAIG H. MISSAKIAN
*United States Attorney*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
*s/ Gabriel I. Schonfeld*
GABRIEL I. SCHONFELD
*Attorneys, Appellate Staff*
*Civil Division, Room 7219*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3306*
*gabriel.i.schonfeld@usdoj.gov*

October 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,842 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Gabriel I. Schonfeld*
Gabriel I. Schonfeld