**No. 26-7139**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**CALIFORNIA NURSES ASSOCIATION,**
**et al.,**
***Plaintiffs-Appellees***
**v.**

**MARKWAYNE MULLIN, et al.,**
***Defendants-Appellants***

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

No. 4:26-cv-10680-AMO
The Hon. Araceli Martínez-Olguín

# BRIEF OF *AMICUS CURIAE* COMMON CAUSE IN SUPPORT OF PLAINTIFFS-APPELLEES' OPPOSITION OF STAY PENDING APPEAL

Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St NW,
Washington, DC 20005
(202) 457-0800

Julia A. Gomez
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081
(213) 977-5200

Angelica Salceda
William S. Freeman
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *amicus curiae* Common Cause states that it is a non-profit entity without a parent corporation and that no publicly held corporation owns 10 percent or more of any stake or stock in *amicus curiae*.

Date: October 28, 2026

/s/ Adriel I. Cepeda Derieux
ADRIEL I. CEPEDA DERIEUX

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................... iii

INTEREST OF AMICUS CURIAE .......................................................................1

INTRODUCTION ...............................................................................................2

BACKGROUND .................................................................................................3

ARGUMENT ......................................................................................................4

I. Incomplete and Outdated Records Cannot Reliably Identify Ineligible Voters. ..........................................................................................4

A. The Government's inability to confirm citizenship is not evidence of unlawful voting...................................................................4

B. Combining additional databases does not make an unconfirmed citizen a noncitizen. ..........................................................6

II. DHS's Matching Procedures Compound the Problem by Attaching Suspicion to the Wrong People.......................................................8

A. Matching names and birthdates does not reliably establish identity.....8

B. A record that someone was once a noncitizen does not show that they voted unlawfully. ........................................................9

C. DHS's review cannot catch these errors before citizens pay for them. ..........................................................................................10

CONCLUSION .................................................................................................12

# TABLE OF AUTHORITIES

## Cases

*Common Cause v. U.S. Department of Justice*,
No. 26-cv-01352 (D.D.C. Apr. 21, 2026) .......... 1

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019) .......... 11

*League of Women Voters v. U.S. Department of Homeland Security*,
No. 25-cv-03501 (D.D.C. Apr. 3, 2026) .......... 1

*Luria v. United States*,
231 U.S. 9 (1913) .......... 9

*Selcuk v. Pate*
No. 24-cv-00390-SHL-HCA, 2024 WL 5054961, (S.D. Iowa Nov. 3, 2024) .......... 5

*Texas LULAC v. Whitley*,
No. SA-19-CA-074-FB, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019) .......... 5

## Other Authorities

Letter from Nancy Morales Gonzalez, Social Security Administration, to Jon Sherman, Fair Elections Center
(July 13, 2023) .......... 2, 4, 5, 9

News Release, Social Security Administration, Social Security Corrects Tens of Millions of Files in the Social Security Number Database Improving the Integrity of Vital Records
(Oct. 20, 2026) .......... 2, 6

Social Security Office of Inspector General, Accuracy of the Social Security Administration's Numident File, A-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 16
(Dec. 2006) .......... 8

## INTEREST OF *AMICUS CURIAE*[1]

Common Cause is a nonpartisan, grassroots organization founded in 1970 and dedicated to fair elections and to making our government more democratic and responsive. It has over one million members and local organizations in twenty-two states plus the District of Columbia, and it helps eligible Americans register, vote, and help their neighbors do the same. It has challenged the federal government's collection, use, and disclosure of voter information and participated as amicus in litigation over changes to the Systematic Alien Verification for Entitlements (SAVE) system. *See* Compl., *Common Cause v. U.S. Dep't of Just.*, No. 26-cv-01352 (D.D.C. Apr. 21, 2026), ECF 1; Br. of Common Cause et al. as Amici Curiae, *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-03501 (D.D.C. Apr. 3, 2026), ECF 79-1.

That work falters when citizens reasonably fear that taking part will expose them to an investigation triggered by the Government's own bad data. Common Cause submits this brief to show that flaws in DHS's data and matching procedures make erroneous investigations of citizens predictable, not merely possible.

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than amicus or its counsel contributed money intended to fund its preparation or submission.

## INTRODUCTION

DHS says its initiative targets unlawful voting while screening out citizens. Defs.' Opp'n Mot. Prelim. Inj. ("PI Opp'n."), ECF 46 at 4-5. Yet DHS's own declarants confirmed that the lists sent to investigators include citizens. Decl. of Nicolas Bartell ("USCIS Decl."), ECF 46-1 ¶9; HSI Decl., ECF 46-2 ¶19. And DHS's assurance is only as good as its data, which the district court found to be "unreliable." Order Granting Prelim. Inj. ("Order"), ECF 87 at 2. DHS now concedes that it uses field interviews "to confirm that the subject is in fact a noncitizen" and that its process "involves a risk of mistake regarding . . . identity or immigration status." Mot. for Stay Pending Appeal ("Stay Mot."), Dkt 8.1 at 1-2. In other words, the citizen is the last safeguard. By the time an interview clears them, the damage is done.

The Government confirms the problem. SSA warns that its records "do not provide definitive information on U.S. citizenship."[2] The day before the district court ruled, SSA disclosed that it was still "correcting an additional 8.5 million records with inaccurate citizenship status."[3] USCIS acknowledges that its matches are not

---

[2] Letter from Nancy Morales Gonzalez, SSA, to Jon Sherman, Fair Elections Ctr. 2 (July 13, 2023) (https://perma.cc/GMX5-WKV5)[hereinafter SSA Letter].

[3] News Release, SSA, Social Security Corrects Tens of Millions of Files in the Social Security Number Database Improving the Integrity of Vital Records (Oct. 20, 2026) https://perma.cc/92MB-E7AV)[hereinafter SSA Release].

final because "[s]imilar names, incomplete records, outdated citizenship information, clerical errors, and other circumstances" may require further review. USCIS Decl. ¶8. That is, it concedes that "errors will result." Order 3. And USCIS admits it weighed the risk that "U.S. citizens might be incorrectly identified as aliens" and proceeded anyway, deeming "any remaining risks" to citizens "outweighed" by its mission. USCIS Decl. ¶¶17, 20.

These defects explain the district court's finding that DHS's stated intent to exclude citizens "does not cure the reasonable fear of citizens being wrongly swept up during the investigations" given "overbroad and inaccurate data sources." Order 14. The Court should deny the stay.

## BACKGROUND

In August, DHS directed HSI to prioritize voter-eligibility investigations in nine states. *Id*. at 2. Plaintiffs challenged two parts of the resulting "Surge": the Voter Eligibility Matching Policy, which generates target lists, and the Field Operations Policy, which sends agents to investigate people on them. *Id.* at 2-4.

The lists draw in part on SAVE, which queries federal record systems but is not a comprehensive citizenship database. Rep. of Dr. Grumbach ("Grumbach Rep."), ECF 10-6 at 6; Response Rep. of Dr. Grumbach ("Grumbach Reply"), ECF 78-4 at 6. The Government says USCIS screens out unsupported referrals. PI Opp'n at 4. The district court found otherwise: personnel treat the source data as

"presumptively valid" and have "no more than twelve minutes to eliminate a person from the target list using [] commercial databases." Order 3. And "[e]ven under the best conditions, there is a high likelihood of error in review because there is no federal database containing citizenship status of U.S. residents." *Id.*

USCIS then creates records in TECS, a tracking system whose records may prompt field operations and "can be used against [an individual] in any interaction they may have with the federal government." Order 3-4 & n.1. According to a whistleblower disclosure, USCIS has created TECS records for U.S. citizens. *Id.* at 2, 4.

## ARGUMENT

### I. Incomplete and Outdated Records Cannot Reliably Identify Ineligible Voters.

#### A. The Government's inability to confirm citizenship is not evidence of unlawful voting.

DHS's initiative rests on an inference its data cannot support: that a person whom federal records fail to identify as a citizen is a suspected unlawful voter. SSA concedes it "does not have citizenship information for all individuals who have been issued an SSN." SSA Letter 2. A missing entry is therefore a gap in the Government's information, not proof of a defect in a citizen's eligibility. Yet the initiative permits targeting, "including instances where DHS simply did not have data to determine that the individual did not engage in voter fraud." Order 9. Failing to fill that gap is

not evidence of a crime—least of all when the gap springs from records the Government knows are incomplete.

Records that do exist can also go stale. Because people need not report a change in immigration status to SSA unless they receive benefits, SSA's citizenship data "merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA." SSA Letter 2. USCIS's declarant agreed that SAVE provides only "point-in-time information." USCIS Decl. ¶11. So a naturalized citizen who obtained a Social Security number while they were a lawful permanent resident may therefore still appear in SSA's records as a noncitizen. *See* SSA Letter 2. That citizen should not have to defend their vote because the Government's file is outdated.

Stale records have subjected citizens to improper suspicion before. Of 98,000 naturalized voters Texas flagged in 2019 by matching driver-license records, only about 80 had been identified as ineligible. *Tex. LULAC v. Whitley*, 2019 WL 7938511, *1 (W.D. Tex. Feb. 27, 2019). The court found that the State's "ham-handed and threatening correspondence" exemplified "the power of government to strike fear and anxiety and to intimidate the least powerful among us." *Id.* And in *Selcuk v. Pate*, the court found a citizenship statement from 2000 "so stale" by 2022 "as to be insufficient, standing alone," to question a voter. 2024 WL 5054961, at *8 (S.D. Iowa Nov. 3, 2024) (denying preliminary relief on other grounds).

"Positive" matches do not solve the problem. The Government stresses that SAVE referred individuals who "positively matched federal records indicating a status other than U.S. Citizen." USCIS Decl. ¶12. But a naturalized citizen's old lawful-permanent-resident record is exactly such a record: the match gets the person right but their citizenship status wrong. Grumbach Reply 7-8. And SAVE referrals were "only a small portion" of what USCIS reviewed; the "substantial majority" came from state and local submissions, "publicly available information, and other lawfully available data." USCIS Decl. ¶14. The Government's best evidence of reliability thus covers only a sliver of its data.

These are not isolated problems. SSA's October 20 announcement shows their reach: the agency had *just* updated "approximately 25 million records that previously had missing citizenship information" and was *still* "correcting an additional 8.5 million records with inaccurate citizenship status." SSA Release. Those figures do not show how many citizens DHS has wrongly flagged. But they do show that gaps and errors in federal citizenship data number in the tens of millions.

### B. Combining additional databases does not make an unconfirmed citizen a noncitizen.

The Government claims it relies on review using USCIS records and additional data sources to screen out citizens. ECF 46 at 5. Piling on databases does not close the gap: passports are voluntary, and older Americans whose SSA

citizenship information may be missing are less likely to hold one. Grumbach Rep. 5-6. A citizen the process cannot confirm is still a citizen.

Nor does volume establish reliability. DHS assembled roughly 100 million records, but 48.2 million were from sources of "questionable provenance" and 50.6 million came from DOJ, including "unreliable commercial versions of voter roll data." Order 2. More bad data is not better data.

Commercial data cannot fill these gaps. USCIS claims it checks voter information "against DHS and commercial database holdings." USCIS Decl. ¶10. Those databases are "typically used for targeted advertising" and contain information such as "residential address, geolocation data, demographics, family structure, car ownership, and consumer behavior." Order 3. They have their own gaps and errors and do not establish citizenship. Grumbach Reply 4-5. Knowing what car someone drives says nothing about whether they may lawfully vote.

Ultimately, these lists decide who gets investigated. The Government calls it "banal" that DHS "begins its investigations . . . on the basis of incomplete information." Stay Mot. 20. But a lead built on data that cannot tell citizens from noncitizens is not ordinary investigative suspicion. Hence, the district court's finding that unreliable data "leaves citizens afraid that their name will be wrongly included in the hundreds of thousands identified for investigation." Order 13.

## II. DHS's Matching Procedures Compound the Problem by Attaching Suspicion to the Wrong People.

### A. Matching names and birthdates does not reliably establish identity.

The Government has known for at least two decades that name-and-birthdate matching is error-prone. In 2006, USCIS warned that because "there may be more than one person with the same name and date of birth," it can be "impossible to know which record is the correct match."[4] That has not changed: USCIS still concedes that "[s]imilar names" and "clerical errors" may require "further manual review" before a match can support a finding of unlawful voting. USCIS Decl. ¶8. Yet the "rigorous analysis" USCIS touts here rests on those same identifiers: names, birthdates, and addresses. *Id.* ¶10.

The errors run both ways. Just as two people can be mistaken for one, a citizen whose records use a married surname or inconsistent spellings may never be matched to the record confirming their citizenship. The Government can therefore miss a record confirming citizenship even when that record is accurate. Grumbach Rep. 7-8.

---

[4] Soc. Sec. Off. of Inspector Gen., Accuracy of the Social Security Administration's Numident File, A-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 16 (Dec. 2006), https://oig.ssa.gov/~assets/audits/full/a-08-06-26100_0.pdf [https://perma.cc/L5A7-G3GE].

### B. A record that someone was once a noncitizen does not show that they voted unlawfully.

These errors fall hardest on naturalized citizens, who have the same right to vote as any other. *See Luria v. United States*, 231 U.S. 9, 22 (1913) ("[A] naturalized citizen stands on an equal footing with the native citizen . . . ."). Yet DHS's policy is to "specifically target naturalized citizens if the data appears to suggest voting occurred before naturalization." Order 3. Its safeguards give way at exactly that point: Even when records suggest a person "may have acquired or derived U.S. citizenship" or "contain material discrepancies," USCIS still refers them to HSI if "the data indicate that the person may have voted or registered to vote prior to naturalization." USCIS Decl. ¶19.

That indication—which the Government now calls "affirmative evidence," Stay Mot. 14, 15 n.5, though it shows only that a person "may have" voted—rests on unreliable data. SSA's records provide only a "snapshot," SSA Letter 2, so delayed updates can make lawful registration after naturalization appear to precede it. Grumbach Reply 7. USCIS does not explain where its dates originate or how it accounts for that lag. *Id.* Bureaucratic delay thus becomes supposed evidence of unlawful voting.

These records also answer the Government's complaint that the injunction is "inscrutable." Stay Mot. 22. DHS's own screening flags records suggesting "acquired or derived U.S. citizenship" or "material discrepancies," USCIS Decl.

¶19—people DHS "should reasonably know or suspect are U.S. citizens." Order 18. The injunction asks only that DHS not send agents to their doors anyway.

### C. DHS's review cannot catch these errors before citizens pay for them.

The Government offers three answers: layered review will catch the errors, remaining errors are rare, and a referral is only a lead. Its admissions refute each one.

*First*, review. HSI's investigations "originate from USCIS," and HSI treats USCIS records as "the best available records." HSI Decl. ¶¶12-13. But USCIS confirms citizenship "to the extent possible," USCIS Decl. ¶18—which, the district court found, means twelve-minute reviews that "further exacerbate the risk of error." Order 3. USCIS's screeners cannot even re-run a SAVE query to check a stale result: the unit "does not have access to the SAVE service." USCIS Decl. ¶15. And while the Government touts a "layered vetting process," Stay Mot. 15, that does not help if every layer draws on the same faulty records. The layers do not catch errors: they independently repeat them.

*Second*, rarity. The Government calls misidentification of citizens "rare." Stay Mot. 16. But HSI admits that "potential inaccuracies were identified in the USCIS lists," HSI Decl. ¶19, and the Government offers no estimate of how often its screening wrongly flags citizens. Grumbach Reply 8. A low average error rate is no comfort to the citizen it gets wrong. Grumbach Rep. 10-11. Worse, USCIS accepted

that risk, proceeding with safeguards merely "intended to reduce" it and deeming "any remaining risks" to citizens "outweighed" by its mission. USCIS Decl. ¶17, 20.

*Third*, the Government says a referral is only a lead HSI reviews before interviewing anyone. PI Opp'n 4-6, 24. But the leads include citizens: "USCIS transmits lists regarding aliens or USCs [that is, citizens]" to HSI, which sends them to ICE to "determine alienage." HSI Decl. ¶19. HSI drops a citizen only after "subsequent review establishes" citizenship—and not even then if there is an "independent basis for investigation." *Id.* ¶23.

DHS now says so outright: In-person interviews are "integral" because they allow DHS to "foreclose the possibility that the target of the investigation is a U.S. citizen." Harris Decl., ECF 90-1 ¶11. And the Government even dismisses as "far too little harm" the prospect that naturalized citizens "will be interviewed by law enforcement in order to confirm that they are noncitizens." Stay Mot. 25. In practice, then, citizens must clear themselves—in person, to an agent. That interview may clear them, but it cannot undo the encounter or the fear it produces.

That harm does not wait for the errors to surface. A chill on protected activity can be irreparable harm "even if it results from a threat of enforcement rather than actual enforcement." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). The district court found "Defendants' threats have already caused [Plaintiffs'] members to withdraw from participating in electoral activity because they

reasonably fear being subjected to physical, legal, or reputational harm to themselves and their loved ones." Order 13. And election work abandoned before Election Day cannot be done afterward.

## CONCLUSION

DHS built its target lists from records it knows are incomplete, screened them in minutes, and sent the results—citizens included—to agents whose interviews are meant to sort out the errors. It has decided that citizens should bear the risk of DHS getting it wrong. With Election Day days away, the injunction puts that risk where it belongs, without impeding lawful investigations. The Court should deny the stay.

Dated: October 28, 2026

Respectfully submitted,

/s/*Adriel I. Cepeda Derieux*

Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St NW,
Washington, DC 20005
(202) 457-0800

Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Julia A. Gomez
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081
(213) 977-5200

Angelica Salceda
William S. Freeman
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 27(d)(2)(A) and 29(a)(5) because it contains 2,599 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Adriel I. Cepeda Derieux*
ADRIEL I. CEPEDA DERIEUX