**No. 26-7139**

# In the United States Court of Appeals for the Ninth Circuit

CALIFORNIA NURSES ASSOCIATION et al.,

*Plaintiffs-Appellees*,

*v.*

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Northern District of California
Case No. 26-cv-10680-AMO

**BRIEF OF LEAGUE OF WOMEN VOTERS AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

ASHURST PERKINS COIE US LLP

Kevin J. Hamilton
Matthew P. Gordon
Jonathan P. Hawley
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
(206) 359-8000
Kevin.Hamilton@ashurstperkins.com
Matthew.Gordon@ashurstperkins.com
Jonathan.Hawley@ashurstperkins.com

Maria Trubetskaya
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
(310) 788-3258
Maria.Trubetskaya@ashurstperkins.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ ii

AMICUS CURIAE'S IDENTITY AND INTEREST ........................................ 1

INTRODUCTION ........................................................ 3

ARGUMENT ........................................................ 6

I. Section 11(b) allows for a private right of action........................ 6

II. Section 11(b)'s sweeping mandate applies to the conduct of federal officials. ........................................................ 8

A. Section 11(b)'s plain language authorizes actions against federal law-enforcement officers. .................................... 9

B. Section 11(b)'s use of the phrase "under color of law" further supports its application to federal law enforcement. ........................................................ 12

C. Excluding federal officials from Section 11(b) would lead to absurd results that contravene the fundamental purpose of theVRA. ........................................................ 13

III. The definitions of the terms "intimidate," "threaten," and "coerce" clearly apply to DHS's challenged conduct................. 15

IV. Section 11(b) does not require purpose or intent to establish voter intimidation........................................................ 18

CONCLUSION ........................................................ 20

CERTIFICATE OF SERVICE........................................................ 21

# TABLE OF AUTHORITIES

## CASES

*Allen v. State Bd. of Elections*,
393 U.S. 544 (1969) ........ 6

*Am. Tobacco Co. v. Patterson*,
456 U.S. 63 (1982) ........ 11

*Ariz. All. for Retired Ams. v. Clean Elections USA*,
638 F. Supp. 3d 1033 (D. Ariz. 2022), *vacated on mootness grounds*, No. 22-16689, 2023 WL 1097766 (9th Cir. Jan. 26, 2023) ........ 15

*Ariz. Democratic Party v. Ariz. Republican Party*,
No. CV-16-03752-PHX-JJT, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ........ 19

*Bd. of Trs. v. Garrett*,
531 U.S. 356 (2001) ........ 10

*Delegates to Republican Nat'l Convention v. Republican Nat'l Comm.*,
No. SACV 12-00927 DOC(JPRx) 2012 WL 3239903 (C.D. Cal. Aug. 7, 2012) ........ 16

*Gowdy v. United States*,
207 F.2d 730 (9th Cir. 1953) ........ 12

*Kennedy v. Meta Platforms, Inc.*,
No. 24-CV-02869-WHO, 2024 WL 4031486 (N.D. Cal. Sept. 3, 2024) ........ 9

*League of Women Voters of Mass. v. Trump*,
840 F. Supp. 3d 101 (D. Mass. 2026) ........ 11

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ........ 9

*Leonard v. Israel Discount Bank*,
199 F.3d 99 (2d Cir. 1999) ........ 13

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ........ 8

*MCI Telecomms. Corp. v. AT&T Co.*,
512 U.S. 218 (1994) ........ 15

*Mi Familia Vota v. Abbott*,
497 F. Supp. 3d 195 (W.D. Texas 2020) ........ 7

*Michigan Welfare Rights Organization v. Trump*,
600 F. Supp. 3d 85 (D.D.C. 2022) ........ 7

*Morse v. Republican Party of Va.*,
517 U.S. 186 (1996) ........ 7

*NAACP v. Blanche*,
No. 26-cv-03626 (D.D.C. Oct. 16, 2026) ........ 3

*Nat'l Coal. On Black Civic Participation v. Wohl*,
498 F. Supp. 3d 457 (S.D.N.Y. 2020) ........ 7, 10

*Nat'l Coal. on Black Civic Participation v. Wohl*,
512 F. Supp. 3d 500 (S.D.N.Y. 2021) ........ 19

*Olagues v. Russoniello*,
770 F.2d 791 (9th Cir. 1985) ........ 7–8

*Olagues v. Russoniello*,
797 F.2d 1511 (9th Cir. 1986) (en banc), *vacated*, 484 U.S. 806 (1987) ........ 8

*Robbins v. Chronister*,
435 F.3d 1238 (10th Cir. 2006) (en banc) ........ 13–14

*Russello v. United States*,
464 U.S. 16 (1983) ........ 10–11, 19

*Screws v. United States*,
325 U.S. 91 (1945) ........ 12

*Sutton v. Providence St. Joseph Med. Ctr.*,
192 F.3d 826 (9th Cir. 1999) ........ 13

*Tcherepnin v. Knight*,
389 U.S. 332 (1967) ....................................................................10

*United States v. Alaska*,
No. 26-cv-00376-SLG (D. Alaska Oct. 22, 2026) .................................... 3

*United States v. California*,
No. 26-cv-12025 (C.D. Cal. Oct. 15, 2026) ............................................ 3

*United States v. Delgado*,
168 F.4th 752 (5th Cir.), *petition for cert. filed*, No. 25-1347
(U.S. June 3, 2026) ......................................................................13

*United States v. Murphy*,
35 F.3d 143 (4th Cir. 1994) ............................................................ 11

*United States v. Tan Duc Nguyen*,
673 F.3d 1259, 1265 (9th Cir. 2012) ..................................................17

*United States v. Otherson*,
637 F.2d 1276 (9th Cir. 1980) ....................................................12–13

*United States v. Stevens*,
559 U.S. 460 (2010) .......................................................................16

*Whatley v. City of Vidalia*,
399 F.2d 521 (5th Cir. 1968) ........................................................ 9–12

**STATUTES**

18 U.S.C. § 242 ...............................................................................12

18 U.S.C. § 594 ....................................................................... 4, 14, 17

42 U.S.C. § 1983 .............................................................................10

42 U.S.C. § 2000a-2 ...................................................................16–17

42 U.S.C. § 3617 .............................................................................17

52 U.S.C. § 10101 ...........................................................................19

52 U.S.C. § 10302 ............................................................................ 6

52 U.S.C. § 10307(b) .................... 4, 9–10

52 U.S.C. § 10310 .................... 6

Cal. Elec. Code § 18540 .................... 17

**RULES**

Federal Rule of Appellate Procedure 29 .................... 1

**OTHER AUTHORITIES**

Daniel P. Tokaji, *Public Rights and Private Rights of Action: The Enforcement of Federal Election Laws*, 44 Ind. L. Rev. 113 (2010) .................... 8

*Federal Prosecution of Election Offenses*, DOJ (Aug. 2007), https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf .................... 18

H.R. Rep. No. 89-439 (1965) .................... 10, 18–19

*Intimidate*, Webster's Third New International Dictionary (1966) .................... 15

R. Sam Garrett, Cong. Rsch. Serv., R47520, *The Voting Rights Act: His-torical Development and Policy Background* (2026), https://www.congress.gov/crs-product/R47520 .................... 4, 8

S. Rep. No. 94-295 (1975) .................... 2

*Threaten*, Merriam-Webster (Oct. 26, 2026), https://www.merriam-webster.com/dictionary/threaten .................... 15

*Threaten*, Webster's Third New International Dictionary (1966) .................... 15

## AMICUS CURIAE'S IDENTITY AND INTEREST

The League of Women Voters (the "League") is a nonprofit, nonpartisan, grassroots membership organization committed to protecting voting rights, empowering voters, and defending democracy.[1] Through advocacy, education, mobilization, and litigation, the League works to ensure that all eligible voters have the information and opportunity to exercise their right to vote.

Founded in 1920 as an outgrowth of the struggle to win voting rights for women, the League now has more than one million members and supporters in nearly 800 communities across all states and the District of Columbia. For more than 100 years, the League has been at the forefront of nationwide efforts to register voters, operating one of the longest-running and largest voter-registration efforts in the nation.

The actions of the Department of Homeland Security ("DHS") challenged in this lawsuit—and the District Court's order enjoining them—directly implicate the League's work. As part of its unlawful-voter initiative, DHS sent armed federal agents to interrogate individuals about their voter

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and (a)(4)(E), the League states that all parties have consented to the filing of this brief; that no party's counsel authored the brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than the League or its counsel contributed money that was intended to fund preparing or submitting the brief.

eligibility, based on target lists drawn from admittedly unreliable data that sweep in U.S. citizens, in nine states—California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin—during the final weeks of voter registration and early voting before the November 3 midterm elections. DHS has publicized those encounters on social media and, as the record reflects, surveilled, covertly infiltrated, and interrogated the staff of at least 148 nonprofits and churches engaged in voter outreach.

The League's volunteers—who register voters, staff community events, and help naturalized citizens and first-time voters participate in elections—are precisely the people whom such tactics are designed to deter. The League therefore has a significant interest in the outcome of this case and offers the perspective of a nationwide, nonpartisan civic organization whose mission depends on voters' willingness to engage with grassroots volunteers in their own communities.

Congress "depend[ed] heavily upon private citizens to enforce the fundamental rights involved" in the Voting Rights Act of 1965 ("VRA"), S. Rep. No. 94-295, at 40 (1975), and civic organizations like the League are often the only parties positioned to act quickly when intimidation occurs in the final weeks before an election. If federal officers could intimidate voters and civic volunteers beyond the reach of Section 11(b) of the VRA, or if plaintiffs

were required to prove what officials subjectively intended, then the private-enforcement scheme Congress built would fail at the very moment, and against the very actors, for which it is most needed. Affirming the District Court's narrow, time-limited injunction preserves the League's ability to carry out its mission through Election Day. The League submits this brief to contextualize the broad sweep of the VRA and demonstrate how reversal or a stay would affect voter registration and mobilization nationwide, particularly during an important election marked by multiple forms of Executive interference.[2]

## INTRODUCTION

In the final weeks before the midterm elections, armed federal agents have been deployed in nine states to interrogate U.S. citizens—in their homes and without notice—about whether they are entitled to vote, selecting their interrogees from target lists the government itself acknowledges are unreliable and publicizing those encounters as part of a campaign of "maximum

[2] *See, e.g.*, *United States v. California*, No. 26-cv-12025 (C.D. Cal. Oct. 15, 2026) (Department of Justice complaint challenging California's refusal to set aside ballots of individuals flagged by Administration as "likely non-citizens"); *United States v. Alaska*, No. 26-cv-00376-SLG (D. Alaska Oct. 22, 2026) (Department of Justice complaint seeking to prevent Alaska from certifying U.S. Senate election result because of alleged voter confusion); *NAACP v. Blanche*, No. 26-cv-03626 (D.D.C. Oct. 16, 2026) (lawsuit seeking to enjoin deployment of poll monitors as part of broader effort to pursue and prosecute individuals based on purported allegations of voter fraud).

pressure." Section 11(b) of the VRA was enacted to stop precisely this kind of conduct. Its command is categorical: "No person, whether acting under color of law or otherwise," may intimidate, threaten, or coerce any person for voting or for "urging or aiding any person to vote." 52 U.S.C. § 10307(b).

Congress enacted the VRA in large part because existing remedies had failed to stop the intimidation of voters.[3] Congress also enacted the VRA and Section 11(b) against a backdrop of federal criminal law that already prohibited federal officials from intimidating voters. *See* 18 U.S.C. § 594. It would therefore make little sense to read the VRA as permitting the most powerful government actors to do what it forbids of everyone else.

Nonetheless, the government's appeal and stay motion rest on the premises that Congress silently exempted federal officers from that prohibition and that intimidation requires either physical force or proof of a subjective purpose to intimidate. Neither premise survives the VRA's text, structure, or history. Section 11(b) applies to *everyone*, whether acting privately or under color of law; prohibits conduct that reasonably instills fear of legal jeopardy, detention, or surveillance; allows for private enforcement; and requires no proof of intent, a requirement Congress deliberately omitted.

---

[3] *See* R. Sam Garrett, Cong. Rsch. Serv., R47520, *The Voting Rights Act: Historical Development and Policy Background* 10 (2026), https://www.congress.gov/crs-product/R47520.

The League is keenly aware of the effects DHS's challenged actions have on the ground. Voter registration and mobilization depend on volunteers who knock on doors, staff tables, and help new citizens navigate the voting process. When the federal government sends armed agents into those same communities to question voters' eligibility, the predictable result is that voters are intimidated and lose faith in the integrity and safety of elections. The District Court's narrow, time-limited injunction protects those activities through Election Day without impairing any legitimate government function. It should be affirmed, and the request for a stay should be denied, for at least three reasons.

*First*, Section 11(b)'s text, history, and broad remedial purpose reinforces a private right of action and supports applying its comprehensive prohibition on voter intimidation to federal officials as well as state and private actors. Its categorical reference to "[n]o person," "whether acting under color of law or otherwise," contains no federal-officer exemption, and creating one would undermine Congress's effort to remove barriers to voting and prevent intimidation.

*Second*, the terms "intimidate," "threaten," and "coerce" were broadly defined at the time the VRA was enacted. Section 11(b)'s prohibition therefore extends beyond physical force or explicit threats to conduct that instills fear of legal repercussions, surveillance, or other adverse consequences.

Door-to-door interrogations and targeting by armed ICE agents fall squarely within that scope because they deter both voting and voter assistance by raising the specter of detention or dangerous encounters with federal law-enforcement personnel.

*Third*, because Congress deliberately omitted a subjective intent requirement, plaintiffs need not prove that defendants intended to intimidate anyone to establish Section 11(b) violations. These principles support affirming the preliminary injunction and denying a stay to protect voters and those who assist them.

## ARGUMENT

### I. Section 11(b) allows for a private right of action.

There is no doubt that private plaintiffs may enforce Section 11(b). Shortly after the VRA's enactment, the Supreme Court recognized that the VRA's goals "could be severely hampered ... if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." *Allen v. State Bd. of Elections*, 393 U.S. 544, 556 (1969).

In 1975, Congress confirmed that understanding by authorizing proceedings instituted by "the Attorney General or an aggrieved person" to "enforce the voting guarantees of the fourteenth or fifteenth amendment," 52 U.S.C. § 10302(a), and amending the VRA to allow for attorney's fees to "the prevailing party, other than the United States," *id.* § 10310(e). As the

Supreme Court explained in construing a parallel provision of the VRA, those amendments "recognize the existence of a private right of action," and "[i]t would be anomalous, to say the least," to treat VRA provisions differently when "all lack the same express authorizing language." *Morse v. Republican Party of Va.*, 517 U.S. 186, 232–34 (1996) (opinion of Stevens, J.).

Consistent with this history and congressional intent, "persuasive authority across multiple districts has found congressional intent to create an implied right of action for § 11(b) specifically within the statutory text, meeting the high bar for implied causes of action." *Mich. Welfare Rts. Org. v. Trump*, 600 F. Supp. 3d 85, 105–06 (D.D.C. 2022) (citation modified) (collecting cases); *see, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020) ("Consistent with Section 11(b)'s broad reach, both the government and private parties may sue to enforce Section 11(b)."); *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195 (W.D. Tex. 2020) ("Congress did not intend to foreclose private causes of action by *also* granting Attorney General enforcement authority." (citation modified)).

This Court has also previously allowed private causes of action to proceed under the VRA and has not held otherwise. *See Olagues v. Russoniello*, 770 F.2d 791, 805 (9th Cir. 1985) (legislative history of VRA supports private rights of action and shows that "a private litigant is entitled to the same

remedy as the Attorney General, as well as attorneys' fees" (citation modified)).[4] Foreclosing private enforcement now would undermine the VRA's remedial protections, especially during a time when the federal government not only declines to enforce those safeguards but violates them itself. Reliance on discretionary government enforcement would leave substantial voter intimidation unchecked and perpetrators unaccountable.[5]

## II. Section 11(b)'s sweeping mandate applies to the conduct of federal officials.

Among other constitutional bases, Congress enacted the VRA to enforce the Fifteenth Amendment's prohibition on racial discrimination in voting, seeking to dismantle Jim Crow practices that had denied equal access to democracy for nearly a century.[6] The VRA served both remedial and preventive purposes: It was designed to remove existing barriers *and* prevent future discrimination, harassment, and intimidation that might obstruct civic participation.[7]

---

[4] The Supreme Court ultimately vacated this Court's subsequent en banc opinion in *Olagues*. *See generally Olagues v. Russoniello*, 797 F.2d 1511 (9th Cir. 1986) (en banc), *vacated*, 484 U.S. 806 (1987). In any event, *Olagues* confirms that this Court has never discounted the availability of a private right of action, and the government's substantive reliance on *Olagues* cannot control.

[5] *See* Daniel P. Tokaji, *Public Rights and Private Rights of Action: The Enforcement of Federal Election Laws*, 44 Ind. L. Rev. 113, 126 (2010) ("[W]here there is a legal right, there is also a legal remedy." (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803)).

[6] *See* Garrett, *supra* note 3, at 4.

[7] *See generally id.*

The government now seeks to exempt federal law-enforcement activities from the VRA's deliberately expansive scope—a position that cannot be reconciled with the plain text of the statute. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) ("When interpreting a statute, we must give words their ordinary or natural meaning." (citation modified)). Section 11(b)'s plain language reaches voter intimidation by *all* persons, including all government officials. The statute focuses on the prohibited conduct—intimidation, threats, and coercion—rather than on the identity of the actor and supplies no exception for federal officers who intimidate, threaten, or coerce voters or those assisting them. In short, the VRA's text, the settled meaning of "color of law," and the absurd consequences of the government's reading all point in the same direction.

### A. Section 11(b)'s plain language authorizes actions against federal law-enforcement officers.

Section 11(b)'s plain language encompasses persons acting under federal, state, and local law alike. It provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). Section 11(b) "is broad and protects both the right to vote and the right to urge others to vote," *Kennedy v. Meta Platforms, Inc.*, No. 24-cv-02869-WHO, 2024 WL 4031486, at *6 (N.D. Cal. Sept. 3, 2024), and prohibits "*anyone* from intimidating, threatening, or

coercing" voters or those "assisting others to vote," *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (emphasis added); *see Wohl*, 498 F. Supp. at 476 ("Section 11(b)'s reach is extensive, in accordance with the VRA's ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote, regardless of race." (citing H.R. Rep. No. 89-439 (1965))).[8]

Section 11(b)'s text begins with the categorical phrase "[*n*]*o person*" and expressly applies "whether acting under color of law *or otherwise*." 52 U.S.C. § 10307(b) (emphasis added). The unmodified word "law" is not limited to any particular source of governmental authority. *Cf.* 42 U.S.C. § 1983 (qualifying application of statute to state- and local-government actors only). Nothing in that text limits the prohibition to state officials or excludes federal officers who invoke their official authority, indicating that Congress's omission was intentional and must be given great weight. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the

---

[8] Moreover, because Section 11(b) is part of a remedial statute, it must be construed broadly to give full effect to its remedial purpose. *See, e.g.*, *Bd. of Trs. v. Garrett*, 531 U.S. 356, 373 (2001) (recognizing that VRA constituted "remedial scheme designed to guarantee meaningful enforcement of the Fifteenth Amendment"); *see also Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[R]emedial legislation should be construed broadly to effectuate its purposes.").

disparate inclusion or exclusion." (citation modified)). Courts have thus allowed similar voting-rights claims against federal officials. *See, e.g.*, *League of Women Voters of Mass. v. Trump*, 840 F. Supp. 3d 101, 119 (D. Mass. 2026) (voter-advocacy organization and states sufficiently alleged Section 11(a) violation against President and other federal officials and agencies). This case should not be treated any differently.

The words "whether" and "or otherwise" reinforce Section 11(b)'s breadth by making the prohibition applicable regardless of whether the challenged conduct carries the imprimatur of governmental authority. It would therefore be inconsistent to read the same statute, adopted by the same Congress, to create an implied exception for federal officers. Excluding federal officers would require this Court to add a limitation that Congress neither contemplated nor wrote. *See United States v. Murphy*, 35 F.3d 143, 145 (4th Cir. 1994) ("Courts are not free to read into the language what is not there, but rather should apply the statute as written"); *see also Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 n.6 (1982) ("Had Congress intended so fundamental a distinction, it would have expressed that intent clearly in the statutory language or the legislative history.").

The VRA's broad prohibitory language has always extended to "official acts of harassment" if intimidating, threatening, or coercive. *Whatley*, 399 F.2d at 526 (noting that VRA's prohibition against any attempted

intimidation, threats, or coercion is "sweeping"). Accordingly, an officer's invocation of federal authority or federal law does not, by itself, place otherwise prohibited voter intimidation beyond Section 11(b)'s substantive reach.

### B. Section 11(b)'s use of the phrase "under color of law" further supports its application to federal law enforcement.

The settled meaning of "under color of law" further confirms the broad reach of Section 11(b).

This phrase has long been understood to reach federal, state, and local officials alike, whether they act within their lawful authority or exceed it while purporting to act in their official capacity. In the context of 18 U.S.C. § 242, which imposes criminal penalties on anyone who acts "under color of any law, statute, ordinance, regulation, or custom" to deprive "any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States," the Supreme Court has recognized that the term "under color of law" extends to federal officers, *Screws v. United States*, 325 U.S. 91, 108 (1945) (plurality opinion) ("He who acts under 'color' of law may be a federal officer or a state officer. He may act under 'color' of federal law or of state law."). This Court has in turn upheld a broad interpretation of "under color of law" and repeatedly extended its reach to federal officers. *See, e.g.*, *United States v. Otherson*, 637 F.2d 1276, 1278 (9th Cir. 1980) (upholding § 242 conviction of border patrol agents and rejecting notion that "under

color of law" applies only to state actors); *Gowdy v. United States*, 207 F.2d 730 (9th Cir. 1953) (similar). The Fifth Circuit recently affirmed this interpretation. *See United States v. Delgado*, 168 F.4th 752, 659 (5th Cir.), *petition for cert. filed*, No. 25-1347 (U.S. June 3, 2026).

The term "under color of law" in Section 11(b) should not be read any differently. "When a legislature borrows an already judicially interpreted phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of that phrase." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834–35 (9th Cir. 1999) (citation modified); *see Leonard v. Isr. Disc. Bank*, 199 F.3d 99, 104 (2d Cir. 1999) ("[R]epetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." (citation modified)). When Congress used the phrase in Section 11(b) in 1965, it therefore adopted a meaning that has encompassed federal officers since 1866.

### C. Excluding federal officials from Section 11(b) would lead to absurd results that contravene the fundamental purpose of the VRA.

Even if Section 11(b)'s terms could be read to admit multiple interpretations, courts must reject any reading that would produce a result Congress was highly unlikely to have intended. *See Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) (en banc) ("When statutory language reasonably

admits of alternative constructions, there is nothing remarkable about resolving the textual ambiguity against the alternative meaning that produces a result the framers are highly unlikely to have intended.").

Here, the government turns this principle on its head, invoking the absurdity doctrine to justify an atextual exemption for federal law enforcement, however intimidating or threatening its conduct might be. But it is *the government's* reading that is absurd: Under its interpretation of the VRA, a private citizen or a county sheriff who stationed armed men at voters' doors to question their eligibility would violate Section 11(b) while armed federal agents doing the same thing—with the added coercive force of arrest, detention, and deportation—would not. That disparity would undermine Congress's intention to addressing the inadequacy of existing protections against official voter intimidation. A statute designed to close those gaps cannot reasonably be read to preserve one for officials wielding federal authority. The VRA's reliance on federal examiners and observers does not suggest otherwise: assigning federal personnel a role in *protecting* access to the ballot hardly can be read to confer a license to *obstruct* it. Indeed, federal officials were already subject to criminal prohibitions on voter intimidation when Congress enacted Section 11(b). *See* 18 U.S.C. § 594. The government's proposed exemption would thus create an anomaly, not resolve one.

### III. The definitions of the terms "intimidate," "threaten," and "coerce" clearly apply to DHS's challenged conduct.

The linchpin of liability under Section 11(b) is whether the defendant intimidated, threatened, or coerced—or attempted to do so. That language readily covers DHS's policies and the enforcement actions they direct at voters. *See, e.g.*, *Ariz. All. for Retired Ams. v. Clean Elections USA*, 638 F. Supp. 3d 1033, 1041 (D. Ariz. 2022) (finding unlawful intimidation includes "[a]ctions or communications that inspire fear of … legal repercussions, privacy violations, and even surveillance"), *vacated on mootness grounds*, No. 22-16689, 2023 WL 1097766 (9th Cir. Jan. 26, 2023).

In giving terms their ordinary meanings, courts consult dictionary definitions, including those contemporaneous with the statute's enactment. *See, e.g., MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 225–28 (1994) (consulting both current dictionaries and those in use when statute was enacted). Here, the dictionary definitions of "intimidate" and "threaten" from the 1960s are instructive. "Intimidate" means to "make timid or fearful" or "inspire or affect with fear," especially "to compel action or inaction (as by threats)."[9] "Threaten" means to "utter threats against" or "promise punishment, reprisal, or other distress."[10] The contemporary definition of "threaten" is also instructive, as the term includes the definition of "to cause

[9] *Intimidate*, Webster's Third New International Dictionary (1966).
[10] *Threaten*, Webster's Third New International Dictionary (1966).

to feel insecure or anxious" or "to portend evil."[11] None of these definitions requires physical force. Each turns instead on the fear that conduct produces or the action or inaction it is meant to compel—which is precisely what an armed agent's unannounced inquiry into a citizen's right to vote accomplishes.

In any event, courts recognize that Section 11(b)'s reach is not frozen in the forms of intimidation most familiar in 1965. *See, e.g.*, *Delegates to Republican Nat'l Convention v. Republican Nat'l Comm.*, No. SACV 12-00927 DOC(JPRx), 2012 WL 3239903, at *11–12 (C.D. Cal. Aug. 7, 2012) (observing that there are few voter-intimidation cases and suggesting that terms "intimidate, threaten, or coerce" might reach beyond conduct at issue in 1960s). And even if the terms could be construed as ambiguous, the doctrine of *noscitur a sociis* requires the understanding of each word in context of the neighboring ones with which it is associated, *see United States v. Stevens*, 559 U.S. 460, 474 (2010)—which indicate that fear and intimidation are in the eyes of the beholder (which is to say, the voter who feels intimidated, threatened, or coerced).

The terms intimidate, threaten, and coerce also closely track the language of other remedial civil-rights statutes, which have not been confined to physical violence or direct threats. *See, e.g.*, 42 U.S.C. § 2000a-2 ("No

[11] *Threaten*, Merriam-Webster (Oct. 26, 2026), https://www.merriam-webster.com/dictionary/threaten.

person shall … intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or privilege[.]"); 42 U.S.C. § 3617 ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of … any right[.]"). And this Court has interpreted a similar provision of the California Elections Code, which criminalizes the use of any "tactic of coercion or intimidation, to induce or compel any other person to refrain from voting." Cal. Elec. Code § 18540. In *United States v. Tan Duc Nguyen*, the Court held that intimidation under that provision is not limited to displays or applications of force but can be achieved through manipulation and suggestion. *See* 673 F.3d 1259, 1265 (9th Cir. 2012). *Tan Duc Nguyen*'s interpretation is especially instructive here, as that case involved a letter warning immigrant voters that voting could lead to incarceration or deportation and that their information would be collected by the government. *Id.* at 1261–62. The fear of immigration consequences and government data collection that the Court recognized as intimidating in that case is the very fear DHS's field operations now produce—only this time delivered not by letter but by a significantly more intimidating tactic, armed agents.

Notably, the Department of Justice ("DOJ"), which is charged with enforcing 18 U.S.C. § 594, has issued agency guidance on the definition of voter intimidation that goes beyond physical force and threats of violence.

The 2007 edition of DOJ's Elections Prosecution Manual defined "[v]oter intimidation" as conduct designed to "deter or influence voting activity through threats to deprive voters of something they already have, such as jobs, government benefits, or, in extreme cases, their personal safety."[12] This definition recognized that voter intimidation is "likely to be both subtle and without witnesses" and that evidence of voter intimidation includes not only threats, duress, and economic coercion but any "aggravating factor that tends to improperly induce conduct on the part of the victim."[13] Similarly, the manual interprets criminal voter intimidation statutes to prohibit a broad range of conduct that is "intended to force prospective voters to vote against their preferences, or refrain from voting, through activity reasonably calculated to instill some form of fear."[14]

## IV. Section 11(b) does not require purpose or intent to establish voter intimidation.

The plain meaning of Section 11(b) does not require a plaintiff to demonstrate that the defendant intended to intimidate, threaten, or coerce others from exercising their right to vote. Indeed, Congress deliberately excluded any intent requirement from this provision. *See* H.R. Rep. No. 89-

---

[12] *Federal Prosecution of Election Offenses*, DOJ 54 (Aug. 2007), https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf.

[13] *Id.* at 55.

[14] *Id.* at 57.

439, at 30 ("[U]nlike the [Civil Rights Act of 1957] (which requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown.").

This statutory contrast confirms the point. The predecessor provision enacted in the Civil Rights Act of 1957 prohibits intimidation "for the purpose of interfering with the right of such other person to vote." 52 U.S.C. § 10101(b). When Congress enacted Section 11(b) eight years later, it omitted that purpose language. That omission must be given its due effect, *see Russello*, 464 U.S. at 23, as courts have consistently recognized, *see, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 516 (S.D.N.Y. 2021) (Section 11(b) applies "regardless of whether defendants acted with the specific intent" to intimidate and regardless of whether conduct "successfully prevents a person from voting"); *Ariz. Democratic Party v. Ariz. Republican Party*, No. CV-16-03752-PHX-JJT, 2016 WL 8669978, at *4 n.3 (D. Ariz. Nov. 4, 2016) ("[T]he plain language of the statute does not require a particular *mens rea*.").

Dispensing with an intent requirement also reflects sound policy, particularly where the government is the instigator of intimidating conduct. Officials engaged in such conduct rarely announce a purpose to suppress votes; they invoke enforcement priorities or data integrity instead. An intent requirement would allow any facially neutral justification to immunize

conduct whose predictable effect is to frighten eligible voters away from the polls. The objective inquiry Congress adopted—whether the conduct would reasonably intimidate, threaten, or coerce—focuses where it should: on the effect of the conduct on voters and those who help them.

## CONCLUSION

The Court should affirm the District Court and deny the pending stay request.

Respectfully submitted this 28th day of October, 2026.

ASHURST PERKINS COIE US LLP

*s/ Kevin J. Hamilton*
Kevin J. Hamilton
Matthew P. Gordon
Jonathan P. Hawley
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
(206) 359-8000
Kevin.Hamilton@ashurstperkins.com
Matthew.Gordon@ashurstperkins.com
Jonathan.Hawley@ashurstperkins.com

Maria Trubetskaya
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
(310) 788-3258
Maria.Trubetskaya@ashurstperkins.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 28, 2026.

*s/ Kevin J. Hamilton*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-7139

I am the attorney or self-represented party.

**This brief contains** 4,457 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated ______.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Kevin J. Hamilton **Date** 10/28/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*