**No. 26-7139**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CALIFORNIA NURSES ASSOCIATION; NATIONAL NURSES UNITED; CITY AND COUNTY OF SAN FRANCISCO; COUNTY OF SANTA CLARA; and VOTO LATINO FOUNDATION,
*Plaintiffs-Appellees,*

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, et al.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:26-cv-10680-AMO (Hon. Araceli Martínez-Olguín)

# BRIEF OF PLAINTIFFS-APPELLEES OPPOSING REQUEST FOR STAY OF PRELIMINARY INJUNCTION

Benjamin R. Farley
Imani Franklin
NATIONAL IMMIGRATION LAW CENTER
PO Box 34573
Washington, D.C. 20043
(213) 639-3900

Jessica Marsden
*Counsel of Record*
Geoffrey Curfman
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038
(202) 579-4582
*jess.marsden@protectdemocracy.org*

*Attorneys for Plaintiffs-Appellees California Nurses Association, National Nurses United, and Voto Latino Foundation*

*(Additional counsel on inside cover)*

Tony LoPresti
Kavita Narayan
Meredith A. Johnson
Bill Nguyen
COUNTY OF SANTA CLARA
70 W. Hedding Street, East Wing
9th Floor
San José, CA 95110
(408) 299-5900

*Attorneys for Plaintiff-Appellee*
*County of Santa Clara*

David Chiu
Yvonne R. Meré
Mollie M. Lee
Sara Eisenberg
Michael A. Keough
Joel F. Wacks
CITY AND COUNTY OF
SAN FRANCISCO
City Hall, Room 234
Fox Plaza, 1390 Market Street, 7th Fl.
San Francisco, CA 94102
(415) 554-4655

*Attorneys for Plaintiff-Appellee*
*City and County of San Francisco*

Beau Tremitiere
PROTECT DEMOCRACY PROJECT
300 Center Ave, Suite G-251
Superior, CO 80027
(202) 579-4582

Hayden Johnson
Zachary West
Ashley Fox
Jane Bentrott
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW, Suite 163
Washington, DC 20006
(202) 579-4582

Elizabeth B. Prelogar
COOLEY LLP
1299 Pennsylvania Ave NW
Washington, DC 20004
(202)776-2076

Anna M. Stapleton
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2750

*Attorneys for Plaintiffs-Appellees*
*California Nurses Association,*
*National Nurses United, and Voto*
*Latino Foundation*

# TABLE OF CONTENTS

Introduction ........ 1

Statement ........ 1

Standard of Review ........ 7

Argument ........ 7

I. CNA Is Likely to Succeed on the Merits ........ 7

A. CNA Has Standing ........ 7

B. Voto Latino Also Has Standing ........ 11

C. Plaintiffs Are Likely to Prevail on Their VRA 11(b) Claims ........ 12

D. The Specific Terms of the Preliminary Injunction Satisfy Rule 65 ........ 18

II. DHS Cannot Show Irreparable Harm ........ 20

III. The Balance of Equities and Public Interest Weigh Heavily Against a Stay ........ 22

Conclusion ........ 24

## INTRODUCTION

Defendants-Appellants (collectively, "DHS") seek extraordinary—and unwarranted—relief: a stay of the preliminary injunction so armed DHS agents can interrogate and harass U.S. citizens about their voter eligibility in the last five days of the 2026 election. DHS urges this Court to disregard the district court's factual findings, ignore binding precedent, and significantly curtail the Voting Rights Act's prohibition on voter intimidation.

DHS is wrong on the facts, the law, and the equities. This Court should deny the requested stay.

## STATEMENT

After weighing the largely uncontested evidence, including internal DHS documents and DHS's declarations, the district court held that DHS's unprecedented elections-related operations create "an objectively reasonable fear of law enforcement entanglements that intimidates" U.S. citizens in violation of section 11(b) of the Voting Rights Act. Dkt.87 ("Order") at 15. To protect the rights of Plaintiffs-Appellees nurses unions (collectively, "CNA") with over 225,000 members nationwide, many of whom are naturalized citizens or live in mixed-status households, the Court entered a narrow injunction through Election Day employing language DHS itself proposed: a prohibition on "elections-related field operations and field interviews in California, Connecticut, Georgia, Missouri, Nevada, New

York, Pennsylvania, Washington, and Wisconsin that involve or are likely to involve persons whom [Defendants] know, suspect, or should reasonably know or suspect are U.S. citizens," including based on records from DHS's faulty target-generating process. Order at 18; *see also* Dkt.46 at 28.

DHS's version of events before this Court bears little resemblance to the district court's factual findings and is derived primarily from three unsubstantiated declarations.[1] Far from the "best information" DHS could use (Br.1), the district court repeatedly explained that DHS's sources and processes for targeting people are knowingly defective. Order at 3, 4, 9, 13, 14, 15. And while DHS describes this initiative as "banal" (Mot.8, 20), the district court found that DHS targets U.S. citizens and is engaged in a propagandized "media campaign showing arrests and interactions with armed officials," which "create a reasonable fear" among U.S. citizens. Order at 13.

DHS's intimidation campaign operates in two phases. First, in the data-matching phase, USCIS compared a presumptive target list to other information systems. Order at 2; *see* Dkt.10-7 at 23-51. On August 21, DHS instructed USCIS agents to urgently review a list of alleged targets. Dkt.10-7 at 23. The "voluminous

---

[1] The Harris Declaration (Dkt.90-1), filed six days *after* the preliminary injunction issued, should be disregarded. *See U.S. v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1218 (9th Cir. 2001).

and unreliable" list includes "48.2 million records that DHS received 'through independent sources' of questionable provenance" and "50.6 million records" DOJ obtained "from unreliable commercial versions of voter roll data" for all nine targeted states. Order at 2. DHS has refused to divulge from whom and when it obtained this data. *See id.* DHS then "enriched" data through what the USCIS trainer described as "supplemental magic," Dkt.10-7 at 41—*i.e.*, the DHS "iLab" system using "unknown artificial intelligence tools to ingest" the data and "create a compiled list of individual profiles" for elections-related operations. Order at 3.

DHS directed USCIS agents to treat the source list as presumptively valid evidence of unlawful voting, and to "exclude" only those individuals they could establish are U.S. citizens. Dkt.10-7 at 44. Agents had a daily review quota, allowing twelve minutes on average to exclude a person from the target list. *Id.* at 50-51. Agents compared available biographic information from the source list—sometimes only names and partial birthdates, Dkt.10-7 at 49-50—to public voter-registration portals, commercial databases, or other government sources. Order at 3. DHS also "specifically target[s] naturalized citizens if the data appears to suggest voting occurred before naturalization," despite lacking accurate matching protocols or reliable information for dates of naturalization or voting. *Id.*

Uncontested expert opinions explain that DHS's source data, matching data, and matching methodologies are unreliable. Dkt.10-6 at 6-12; Dkt.78-4 at 3-11. DHS

knows of these flaws. *E.g.*, Dkt.79-1 at 4 (internal email reflecting only "some degree of confidence"). To illustrate, one core DHS source is Social Security information, but USCIS concedes that information "may not be accurate," Dkt.10-7 at 44, and the SSA recently revealed it "is currently in the process of correcting an additional 8.5 million records with inaccurate citizenship status." Request for Judicial Notice ("RJN")1.[2]

Undeterred, DHS proceeded to generate TECS records for individuals it suspects of unlawful registration or voting. In California alone, USCIS recently created TECS records for "potentially thousands or tens of thousands" of people for elections-related investigations, "based on data that an officer may have good reason to believe is unreliable or inaccurate without corroboration." Dkt.10-7 at 42. Across all target states, Secretary Mullin has claimed there are "300,000 [people] that [DHS] suspect[s] voted illegally." RJN2. Such broad claims have collapsed under scrutiny. *E.g.*, Dkt.79-5 (of 16,000 flagged Nevada voters, zero were noncitizens); *see also* RJN3 (analysis of purported unlawful voters in Los Angeles identifying numerous errors and false positives); RJN4 (same for Santa Clara). And DHS does not dispute that it "created TECS records for U.S. citizens." Order at 4.

---

[2] Members of this Court questioned the reliability of DHS's target lists and unsubstantiated declarations. *U.S. v. California*, 2026 WL 3212945, at *13 n.4 (9th Cir. Oct. 26, 2026) (Bennett, J., concurring); *id.* at *19-20 (Sanchez, J., concurring).

Second, in the field-operations phase, DHS "surged" agents across nine states during "voter registration and early voting." Order at 4. DHS deployed armed agents to homes for "field interviews" interrogating residents' voter eligibility "to resolve the discrepancies" from the data-matching phase. *Id.* (quoting DHS brief). DHS concedes these operations sweep in U.S. citizens and specifically "target[] some naturalized citizens." *Id.*

Core to the field-operations phase is DHS's propaganda. An August memo "directs agents to document investigative findings" in a new "[p]ortal outside the normal operational process so that photos and videos can be used by national DHS staff in media and reporting." *Id.* at 4 (quotations and alterations omitted); RJN6-10. DHS's widely publicized video of militarized agents shackling 72-year-old Omar Muñoz in an October 19 pre-dawn raid exemplifies the fear campaign at work. RJN6; *see also* Order at 4-5 (describing numerous DHS posts). According to a senior DOJ official, the goal of the media campaign is "sending a signal" that the government is targeting people for arrest in this election. RJN11.

* * *

As the district court found, DHS used "faulty data sources that sweep in U.S. citizens" and targeted some naturalized citizens, "announced the deployment of armed officers in a militarized action to individuals' homes and communities," and then promoted a "media campaign showing arrests and interactions with armed

officials." Order at 13. Together, those actions "create a reasonable fear of harm to" U.S. citizens constituting unlawful intimidation. *Id.*

DHS's flawed and intimidating surge in voting-related investigations is part of a broader campaign of election-related threats and operations, which depart from longstanding executive policy to "not engage in overt criminal investigative measures" involving elections due to the "risk of chilling legitimate voting and campaign activities." Dkt.10-7 at 64, 414; *accord id.* 618, 928. The year-long escalation in DHS violence, including against U.S. citizens, is also relevant context. *E.g.*, Dkt.79-9 (recounting 506 DHS-citizen incidents); *see also Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1189-90 (9th Cir. 2026); *Vasquez Perdomo v. Noem*, 148 F.4th 656, 667 (9th Cir. 2025).

* * *

The district court entered the preliminary injunction on October 21, concurrently issuing a stay that afforded DHS an opportunity for appellate review. The stay expired on October 23 without any DHS action—other than DHS's General Counsel posting on social media that the order would not affect "most operations about noncitizen voting." RJN12. On October 26, DHS noticed an appeal and then a day later—six days after the ruling below—filed this "emergency" motion.

## LEGAL STANDARDS

A stay "is not a matter of right," but "an exercise of judicial discretion" where the movant "bears the burden" to "justify" this "extraordinary" remedy under four factors: a "strong showing" of success on the merits; irreparable injury "absent a stay"; lack of substantial injury to "other parties interested"; and the "public interest." *Nken v. Holder*, 556 U.S. 418, 427, 432-34 (2009).

The first two factors are "the most critical," and, here, the final two merge. *Id.* DHS "must demonstrate that irreparable harm is likely, not just possible." *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011). Absent "a certain threshold showing regarding irreparable harm … a stay may not issue, regardless of the [movant's] proof regarding the other stay factors." *Id.* at 965.

This Court "review[s] the district court's findings of fact for clear error, its legal conclusions de novo, and the injunction's scope for abuse of discretion." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 824 (9th Cir. 2020).

## ARGUMENT

### I. CNA Is Likely to Succeed on the Merits

#### A. CNA Has Standing

The nurses unions have associational standing. Order at 7-11. *First*, CNA's U.S. citizen members would "have standing to sue in their own right." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025). They are suffering concrete

injuries traceable to DHS's field operations because they have abstained from attending voter-mobilization events, Dkt.10-1 ¶¶ 18-27, based on a "realistic danger" that DHS will erroneously target them for election-related interrogations, and the Court's injunction will redress those credible fears, *Mi Familia*, 129 F.4th at 709 (citation modified); *see Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019); *Perdomo*, 148 F.4th at 674, 676. DHS does not seriously dispute that CNA satisfies the other requirements—germaneness and no individual participation—for associational standing. Order at 10-11. Additionally, DHS's operations have compelled CNA's members to vote by mail rather than in person. Dkt.10-1 ¶ 25. That too is a cognizable injury, as individuals suffer cognizable voter intimidation injuries when challenged conduct creates reasonable fear and they take steps to lessen risks, even if the intimidation does not "successfully prevent[] a person from voting." *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 516 (S.D.N.Y. 2021); *LULAC v. Pub. Int. Legal Found.*, 2018 WL 3848404, at *3-4 (E.D. Va. Aug. 13, 2018).[3]

CNA members reasonably fear coercive encounters with DHS; to mitigate those risks, members are avoiding electoral engagement and are compelled to vote by mail. Dkt.10-1 ¶¶ 7-9, 12-17, 23-38, 42-46 (uncontested CNA/NNU facts);

---

[3] This Court may find standing on this alternative basis. *See Trump v. Cook*, 609 U.S. 528, 550 n.3 (2026).

Dkt.78-1 ¶¶ 8, 12-23 (same); Dkt.10-6 at 6-12 (uncontested expert opinion on naturalized citizen risks); Dkt.78-4 at 12-15 (same on intimidation effects).[4] That is a sufficient 11(b) voting injury, and CNA's "affirmative steps to avoid the risk of harm" are cognizable. *Meese*, 481 U.S. at 475; *accord DHS v. League of Women Voters*, 2026 WL 2879700, at *2 (U.S. Sept. 25, 2026) (reaffirming *Meese*).

None of Defendants' arguments hold water. To begin, precedent directly contradicts their argument that Plaintiffs assert "speculati[ve]" injuries. Mot.19. In *Mi Familia*, an association had standing to challenge a law permitting officials to cancel a voter's registration when they had "reason to believe" the individual was a noncitizen. 129 F.4th at 708. Like here, DHS relied on a data source lacking current or accurate information, which created a "realistic danger" that someone among the 1,000 association members would be affected. *Id.* Similarly, in *Perdomo*, an association with "thousands of members" in the state had standing to challenge DHS's pattern of "high-volume" suspicion-less detentions because the members changed their behavior based on "reasonable fear" of coercive DHS encounters. 148 F.4th at 676–77.

The basis for standing is stronger here. CNA has 250,000 members nationwide (including 115,000 in California), many of whom are naturalized citizens

---

[4] Uncontested expert testimony is pertinent to finding objective fear and injuries. *Meese v. Keene*, 481 U.S. 465, 473-74 (1987).

or live in mixed-status households. Dkt.10-1 ¶ 12; Dkt.78-1 ¶ 5. The government has ostensibly identified 300,000 targets nationwide, and thousands in California, using data and processes the district court found are likely to wrongly target U.S. citizens, Order at 3, particularly naturalized citizens and those in mixed-status households. *See* Dkt.10-6 at 6–10; Dkt.10-7 at 36–37, 46, 50–51; Dkt.79-1 at 4. DHS admits using interrogations to "resolve the discrepancies" in its data and matching processes, Order at 4 (quoting Dkt.46 at 30), and that it is targeting naturalized citizens, *see* Order at 3; Dkt.46-1 ¶¶ 9, 19; Dkt.46-2 ¶¶ 19, 23. CNA members thus changed their behavior based on a realistic threat of facing coercive interactions with DHS, suffering cognizable injuries.

Like *Perdomo*, this case is a "far cry" from *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), because CNA "seek[s] to enjoin [DHS's] stops themselves, not some subsequent conduct" like a chokehold "that might occur only after a stop," and their members "cannot escape future injury [merely] by avoiding unlawful activity." *Perdomo*, 148 F.4th at 675. Further, *Clapper v. Amnesty Int'l USA*, is inapposite because those plaintiffs failed in challenging the abstract *authorization* of surveillance, lacking factual specificity or "actual knowledge of the Government's … targeting practices" showing risk to them. 568 U.S. 398, 411-12 (2013). Here, however, the district court found significant evidence showing that DHS uses faulty data, specifically targets naturalized citizens, like CNA's members, and executes

widely publicized field operations. *Supra* Statement. These circumstances are akin to *Perdomo* and *Mi Familia Vota*, not *Lyons* or *Clapper*.

### B. Voto Latino Has Standing

This Court could alternatively conclude that Plaintiffs are likely to prevail on the merits based upon standing for Voto Latino, the nation's largest Latino voter registration and turnout organization. *Cf.* Order at 8. DHS has obstructed Voto Latino's core operations to "urge and aid" Latino U.S. citizen voters. Voto Latino's constituencies reasonably fear coercive DHS encounters, so rather than undertake normal mobilization events, Voto Latino must adjust and develop programs to recognize, document, and overcome DHS threats. Dkt.10-5 ¶¶ 8-15; Dkt.78-2 ¶¶ 6, 8. Voto Latino as an organization is also harmed because DHS is targeting and infiltrating large voter turnout organizations, roughly 150 as of July, including one of Voto Latino's close partners. Order at 5; Dkt.77-1 at 4.

DHS thus "directly affects and interferes with [Voto Latino's] core business activities." *Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622, 633 (9th Cir. 2026) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)) (citation modified); *see also Colo. Mont. Wyo. State Area Conference of the NAACP v. Smith*, 180 F.4th 1266, 1274-76 (10th Cir. 2026) (affirming organizational standing based on analogous facts in voter-intimidation door-knocking case). *Arizona Alliance* also reaffirmed standing for organizations like Voto Latino that face a "credible threat of

enforcement," *id.* at 640, as DHS is searching for "organizations potentially facilitating unlawful voter registration or voting activity" to "initiate prosecutions." Dkt.79-2 at 6, 33, 134.

### C. Plaintiffs Are Likely to Prevail on Their VRA 11(b) Claims

Section 11(b) prohibits any actions, by any person, that "intimidate, threaten, or coerce" "any person for voting," or "urging or aiding" voting, or "attempt[s]" to do so. 52 U.S.C. § 10307(b). It broadly protects electoral activity. *Id.* § 10310(c)(1). The district court correctly held that DHS's elections-related operations, which DHS concedes involve U.S. citizens, unlawfully intimidate Plaintiffs. Order at 11-15. DHS's contrary arguments narrow 11(b) beyond recognition.

*First*, DHS disregards 11(b)'s text and governing standards. Mot.24-27. The text is broad and must be applied in "the broadest possible scope." *Colo. NAACP*, 180 F.4th at 1281. "Intimidate" means to "make timid or fearful" or "inspire or affect with fear"; "coerce" means "to compel to an act or choice by force, threat, or other pressure"; and "threat" or "threaten" means "to exert pressure on," "promise punishment, reprisal, or other distress," or "to have a menacing appearance." Webster's Third New International Dictionary 439, 1183, 2382 (1966). The prohibited conduct "may take on many forms." *U.S. v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961). And 11(b) equally protects voting and "urging or aiding" activities.

*Whatley v. City of Vidalia*, 399 F.2d 521, 522-23 (5th Cir. 1968); *accord* RJN13 at 1 (DOJ Factsheet).

Section 11(b)'s "core analysis," as the district court explained, "is whether the 'activities ha[ve] generated fear' that is objectively reasonable." Order at 12. Fears of physical harm and of "legal repercussions, privacy violations, and even surveillance" suffice. *AARA v. Clean Elections USA*, 638 F. Supp. 3d 1033, 1041 (D. Ariz. 2022) (collecting cases). Reasonableness is judged "against the background of contemporaneous events" and "the general climate prevailing." *U.S. v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (similar reasonableness analysis under section 131(b) of the Civil Rights Act).

Because a "general coercive effect" establishes intimidation, *id.* at 741, nothing in 11(b) requires specific targeting of an intimidated voter. *Cf.* Mot.26. "[U]ndetected or less than blatant acts" that "nonetheless drive the voter away before remedial action can be taken" are sufficient. *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality op.). Nor does 11(b) require that such intimidation "successfully prevent a person from voting." *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 116 (S.D.N.Y. 2023). It prohibits "threats," "attempts," and even intimidation subtler than DHS's concededly "vigorous[]" and "unusual[]" high-visibility campaign, Mot.27, which makes voters reasonably fearful and compels them to mitigate risks. Analogous schemes that threatened to wrongly target voters,

including through door-knocking, were deemed voter intimidation. *E.g.*, *Wohl*, 661 F. Supp. 3d at 112-17; *LULAC*, 2018 WL 3848404, at *3-4; *Colo. NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861, 870 (D. Colo. 2023), *rev'd on other grounds*, 180 F.4th 1266 (10th Cir. 2026); *see also U.S. v. Nguyen*, 673 F.3d 1259, 1264-66 (9th Cir. 2012) (preventing "manipulation" of citizens); RJN5 at 2-3 (DOJ door-knocking letter).

*Second*, DHS claims, without authority, that "intimidation can violate Section 11(b) only if it is 'because of'" protected activities. Mot.26-27. But DHS reads into 11(b) the exact purpose requirement that Congress rejected to avoid shortcomings in section 131(b), the preexisting intimidation statute containing an explicit "for the purpose of" requirement. 52 U.S.C. § 10101(b); *Wohl*, 661 F. Supp. 3d at 116. Then-Attorney General Katzenbach drafted 11(b) of the VRA so that "no subjective 'purpose' need be shown" and "defendants would be deemed to intend the natural consequences of their acts." Ben Cady, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173, 190 (2015) (quoting testimony). DHS cannot superimpose a purpose requirement on 11(b). *AARA*, 638 F. Supp. 3d at 1041.

*Third*, to deny this stay, the Court need not decide whether DHS's "action is completed pursuant to legal authority" like 18 U.S.C. § 611 because that "does not make the act necessarily lawful." Order at 14. In law-enforcement intimidation

cases, "[a]cts otherwise entirely within the law may violate [voter-intimidation statutes] if they have the proscribed" intimidation effect. *McLeod*, 385 F.2d at 740-41 & n.12 (interpreting 131(b)); *accord U.S. v. Clark*, 249 F. Supp. 720, 724-29 (S.D. Ala. 1965) (three-judge court). DHS's abstract authority is "no excuse or defense" for intimidation. *U.S. v. Bruce*, 353 F.2d 474, 476-77 (5th Cir. 1965); *Beaty*, 288 F.2d at 656. These conclusions apply equally to 11(b). *E.g.*, *Whatley*, 399 F.2d at 526; *Jolt Initiative v. Paxton*, 821 F. Supp. 3d 706, 726 (W.D. Tex. 2026). The district court rightly protected voting rights regardless of DHS's claimed authority.

DHS's reliance (Mot.27-28) on *U.S. v. Holmes*, 385 F.2d 145, 149 (5th Cir. 1967), underscores the weakness of its position. The government there sought injunctive relief for Black citizens subjected to poll testing and registration workers arrested on arson charges while investigating a fire at a Black voter's home. *Id.* at 147. The Fifth Circuit, reviewing the denial of injunctive relief more than four years following the underlying events, concluded that "time and outside events have worked toward an affirmance." *Id.* at 146 (citation omitted). No court has relied on *Holmes*, much less to import a purpose requirement to 11(b) and justify harassing law-enforcement operations. This Court should decline DHS's invitation to be the first.

To the contrary, serious questions about DHS's authority support *denying* the stay. *U.S. v. Cox*, 2026 WL 2948729, at *3-17 (S.D. Fla. Oct. 1, 2026) (holding 18 U.S.C. § 611 unconstitutional). There is no support for DHS using *immigration* authorities to harass *U.S. citizens* for the next few days. DHS has a clear alternative path: follow decades-long executive policy to avoid elections-related operations during voting.

*Finally*, 11(b) is privately enforceable under *Gonzaga University v. Doe*, 536 U.S. 273 (2002), as is well-established within the Ninth Circuit. *E.g.*, *AARA*, 638 F. Supp. 3d at 1041. The district court correctly followed *Michigan Welfare Rights Organization v. Trump*, Order at 12, which details the Supreme Court's reasoning resolving this question. 600 F. Supp. 3d 85, 104-07 (D.D.C. 2022) (applying, *e.g.*, *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996)).

DHS does not contest 11(b)'s rights-creating language and "focus on the benefited class." *Gonzaga*, 536 U.S. at 284. This Voting *Rights* Act provision protects "any person … voting" or "urging or aiding" voting from the "prohibited acts" of "intimidat[ion], threat[s], coerc[ion], or attempt[s]." 52 U.S.C. § 10307. This text is equally, if not more, rights- and class-creating as the statute in *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 181-86 (2023).

Section 11(b) also "manifests an intent to create … a private remedy." *Gonzaga*, 536 U.S. at 284. *Morse* explained that Congress amended the VRA to

enable actions "brought by … an aggrieved person" and to permit fees for prevailing parties "other than the United States." 517 U.S. at 232-34. These amendments establish that the VRA's prohibitions, including 11(b), have private remedies. *Mich. Welfare*, 600 F. Supp. 3d at 105-06.

DHS provides no compelling reason to depart from the vast caselaw supporting 11(b)'s private right-of-action. Its constitutional-basis arguments (Mot.19) fail because 11(b) is grounded, at minimum, in the First, Fourteenth, and Fifteenth Amendments; the Elections Clause; and Congress's necessary-and-proper "power to protect the man who votes from personal violence or intimidation." *Ex Parte Yarbrough*, 110 U.S. 651, 661 (1884). Regardless, this case is about government intimidation, and any question about applying 11(b) to private intimidators is immaterial. *Cf.* Mot.26.

Accepting DHS's DOJ-enforcement-only argument impedes Congress's design for 11(b) to prohibit "official acts of harassment," *Whatley*, 399 F.2d at 526, because it would atextually excuse federal agents from liability. Section 11(b) restrains any "person, whether acting under color of law or otherwise." 52 U.S.C. § 10307. "[P]erson" is read broadly and covers federal agents. *NAACP*, 180 F.4th at 1276-83; *accord* RJN13 (DOJ Factsheet). The Court should reject DHS's misreading that would "severely hamper" 11(b) and allow intimidation by federal agents. *See Morse*, 517 U.S. at 231.

Regardless, DHS ignores CNA's inherent equitable action under *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *accord Newsom v. Trump*, 2026 WL 3180273, at *15 (9th Cir. Oct. 23, 2026).

### D. The Injunction Satisfies Rule 65

DHS's argument (Mot.28-30) that the preliminary injunction is impermissibly vague fails. This Court has consistently declined to "set aside injunctive provisions unless they are so vague that they have no reasonably specific meaning." *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 952 (9th Cir. 2025).

The injunction satisfies that standard. The district court enjoined DHS from "conducting elections-related field operations and field interviews" if such operations "involve or are likely to involve persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens," including when such operations are "based wholly on TECS records generated from" the defined surge of DHS desk investigations. Order at 18. Those requirements, read "in light of the circumstances" and "the mischief that the injunction seeks to prevent," reach only the specific behaviors that the district court found to be unlawfully intimidating to U.S. citizens seeking to lawfully participate in the upcoming election. *See U.S. v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972). The injunction has narrowed geographic (nine states DHS targeted) and durational (until polls close) limits. Order at 18.

DHS isolates certain words in the order that it complains that it cannot comprehend. Mot.29. But the order's phrasing is materially identical to the language DHS told the district court it "should" impose in granting any relief, "such that DHS would, for a limited period of time, be prevented from conducting field operations directed at individuals whom the agency knows or reasonably should know to be a U.S. citizen." Dkt.46 at 37. DHS's complaint is an appellate attack on a ruling DHS itself induced. *See Deland v. Old Republic Life Ins. Co*., 758 F.2d 1331, 1336–37 (9th Cir. 1985).

That the district court enjoined only those operations in which the government has the requisite degree of scienter regarding citizenship status enhances the order's clarity. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). This Court has previously upheld an injunction barring federal officers from using force against anyone "whom they know or reasonably should know is a Journalist or Legal Observer." *Index*, 977 F.3d at 834, 841 n.3. DHS agents are familiar with these standards of knowledge or suspicion: immigration officers make warrantless arrests when they have "reason to believe" a person is unlawfully present, 8 U.S.C. § 1357(a)(2), and detentions on "reasonable suspicion" of unlawful presence, *Noem v. Perdomo*, 146 S. Ct. 1, 1 (2025) (Kavanaugh, J. concurring) (citing 8 U. S. C. §1357(a)(1)). DHS cannot credibly claim ignorance as to its obligations under those standards.

The remedy for a perceived, asserted ambiguity is clarification by the district court, which retains such authority. *See* Fed. R. Civ. P. 62(d); *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001). Should this Court conclude that the injunction is unclear, it should modify the order or remand for clarification. *See Perdomo*, 148 F.4th at 686.

## II. DHS Cannot Show Irreparable Harm

DHS fails to show that it would suffer irreparable harm absent a stay, so the motion must be denied. *Leiva-Perez*, 640 F.3d at 965-68. Indeed, such a stay, rather than "minimiz[ing] harm while an appellate court deliberates," *U.S. v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring), would irreparably harm CNA by inviting interrogations of U.S. citizens during the final days of voting.

DHS's "long delay" in seeking relief—waiting nearly a week to seek appellate review and allowing the district court's stay to expire—"implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

Further, the injunction only covers unlawful conduct, and DHS suffers no cognizable harm by being prevented from doing what federal law forbids. *See Danco Lab'ys, LLC v. Louisiana*, 146 S. Ct. 1192, 1196 (2026) (Alito, J., dissenting) (the "inability to engage in [unlawful] conduct" cannot constitute irreparable harm); *Abbott v. Perez*, 585 U.S. 579, 602 (2018) (same).

DHS's citation (Mot.30) to *Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025), for the conclusory assertion that this order causes irreparable harm by violating the separation of powers is unavailing. *CASA* found irreparable harm "[w]hen a federal court enters a universal injunction against the Government" because it would "exceed the authority conferred by the Judiciary Act." *Id.* at 859-60. As explained above, this narrowly tailored order, confined to nine states, falls well within a district court's authority to provide injunctive relief.

DHS's further argument (Mot.30-31) that the order unduly treads on the Executive's prerogative to investigate crimes likewise lacks merit. While "the executive has discretion over prosecutorial decisions, it has no discretion to violate the constitutional rights of individuals," including the right to vote. *Smith v. Meese*, 821 F.2d 1484, 1491–92 (11th Cir. 1987). That principle applies equally to DHS investigations. *See Zepeda v. U.S. Immig. & Nat. Serv.*, 753 F.2d 719, 725–27 (9th Cir. 1983); *see also McLeod*, 385 F.2d at 750, 752 (enjoining state and local investigations that violated federal statute prohibiting voter intimidation). The district court did not prevent DHS from investigating voter fraud; it merely directed DHS to do so in a manner that would not unlawfully intimidate U.S. citizens in the final days of the election.

DHS's handwringing (Mot.32) over its purported inability to "identify and arrest an alien who would have voted in" this election also fails to establish

irreparable harm. The injunction does not apply to DHS operations in 41 states and the District of Columbia. Where the injunction does apply, DHS remains free to review records, develop leads, investigate noncitizens, and prosecute bona fide violations. The order bars only elections-related field operations involving U.S. citizens until polls close, which according to DHS's General Counsel would not affect "most operations about noncitizen voting." RJN12.

That DHS elected to surge operations during the midterms—when the intimidating effects are most egregious—is a "self-inflicted harm" that is not "irreparable." *See Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003). The unprecedented nature of this initiative further weakens DHS's irreparable harm argument: until this year, federal policy restrained such "overt" operations that "chill[]" electoral activity. *Supra* Statement.

Finally, DHS's claims must be understood in context: "other courts have found that the federal government has failed to establish that significant fraud threatens the reliability of upcoming elections." Order at 16 n.2 (collecting cases).

## III. The Balance of Equities and Public Interest Weigh Heavily Against a Stay

A stay would "substantially injure" Plaintiffs, *Nken*, 556 U.S. at 434, a consideration DHS elides. DHS is causing CNA to withdraw from protected electoral activity. Order at 9, 13. Voting is well underway; the dispute here is whether the injunction may narrowly protect CNA's fundamental interests for

another five days. Each day U.S. citizens are relieved of their reasonable fear of DHS harassing them is critical—once the election occurs, "there can be no do-over and no redress." *LWV of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *accord Burson* 504 U.S. at 209.

The injunction expires when polls close. Since October 23, it has maintained and restored the longstanding status quo in which eligible voters, and those who help them, can participate free from fear of government intimidation caused by elections-related operations during voting. *See Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019). Staying the injunction would permit armed field operations involving U.S. citizens in the final days of voting, and effectively reverses and decides the case in DHS's favor.

An overwhelming public interest favors free and fair elections. *See Am. Encore v. Fontes*, 152 F.4th 1097, 1120 (9th Cir. 2025). Particularly in 11(b) cases, the public has a "strong interest in remaining free from intimidation and in the fair and impartial administration of elections." *Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 (D. Minn. 2020); *accord Jolt*, 821 F. Supp. 3d at 727.

Next Tuesday evening, the modest limitations on DHS operations lift entirely. There is no countervailing DHS interest in elections-related field operations involving U.S. citizens before then.

## CONCLUSION

The Court should deny DHS's motion to stay.

Respectfully submitted,

October 28, 2026

*/s/ Jessica Marsden*
Jessica Marsden
*Counsel of Record*
Geoffrey Curfman
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038
(202) 579-4582

Beau Tremitiere
PROTECT DEMOCRACY PROJECT
300 Center Ave, Suite G-251
Superior, CO 80027
(202) 579-4582

Hayden Johnson
Zachary West
Ashley Fox
Jane Bentrott
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW, Suite 163
Washington, DC 20006
(202) 579-4582

Benjamin R. Farley
Imani Franklin
NATIONAL IMMIGRATION LAW CENTER
PO Box 34573
Washington, D.C. 20043
(213) 639-3900

Elizabeth B. Prelogar
COOLEY LLP
1299 Pennsylvania Ave NW

Washington, DC 20004
(202)776-2076

Anna M. Stapleton
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2750

*Attorneys for Plaintiffs-Appellees California Nurses Association, National Nurses United, and Voto Latino Foundation*

David Chiu
Yvonne R. Meré
Mollie M. Lee
Sara Eisenberg
Michael A. Keough
Joel F. Wacks
CITY AND COUNTY OF
SAN FRANCISCO
City Hall, Room 234
Fox Plaza, 1390 Market Street, 7th Fl.
San Francisco, California 94102
(415) 554-4655

*Attorneys for Plaintiff-Appellee City and County of San Francisco*

Tony LoPresti
Kavita Narayan
Meredith A. Johnson
Bill Nguyen
COUNTY OF SANTA CLARA
70 W. Hedding Street, East Wing
9th Floor
San José, CA 95110
(408) 299-5900

*Attorneys for Plaintiff-Appellee*

*County of Santa Clara*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because this brief contains 5,192 words excluding the accompanying documents authorized by Rule 27(a)(2)(B). This brief complies with the typeface and type-style requirements of Rule 27(d)(1)(E) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

October 28, 2026

*/s/ Jessica Marsden*
Jessica Marsden

*Attorney for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I, Jess Marsden, hereby certify that on October 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. A true and correct copy of this brief has been served via the Court's ACMS system on all counsel of record.

*/s/ Jessica Marsden*
Jessica Marsden

*Attorney for Plaintiffs-Appellees*