**No. 26-7139**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CALIFORNIA NURSES ASSOCIATION; NATIONAL NURSES UNITED; CITY AND COUNTY OF SAN FRANCISCO; COUNTY OF SANTA CLARA; AND VOTO LATINO FOUNDATION,

*Plaintiffs-Appellees*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Northern District of California, No. 4:26-cv-10680 (Hon. Araceli Martínez-Olgún)

**BRIEF OF *AMICUS CURIAE* JUSTICE CONNECTION IN SUPPORT OF PLAINTIFFS-APPELLEES AND DENIAL OF DEFENDANTS-APPELLANTS MOTION FOR IMMEDIATE ADMINISTRATIVE STAY AND STAY PENDING APPEAL**

Bruce Spiva
Dana Paikowsky
Rachel Appel
Alice C.C. Huling
**CAMPAIGN LEGAL CENTER**
1333 New Hampshire Ave. NW
Suite 300
Washington, DC 20036
(202) 736-2200
bspiva@campaignlegalcenter.org

*Counsel for amicus curiae Justice Connection*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1-1, *Amicus Curiae* Justice Connection certifies that they are non-profit corporations with no parent corporations, and that no public held company own any interest in them.

## TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iii

INTEREST OF *AMICUS CURIAE* .......... 1

INTRODUCTION .......... 2

Argument .......... 3

I. The novel interpretations of Section 11(b) the United States now advances are inconsistent with its past enforcement and the statute's text, context, and precedent. .......... 3

II. The challenged practices are inconsistent with longstanding government policy and practice related to law enforcement activities around elections. .......... 7

CONCLUSION .......... 12

CERTIFICATE OF COMPLIANCE .......... 13

# TABLE OF AUTHORITIES

**Cases** **Pages**

*Burson v. Freeman*, 504 U.S. 191 (1992) .......... 10

**Statutes**

52 U.S.C. § 10307(b) .......... 2

**Other Authorities**

Complaint, *NAACP v. Blanche*, No. 1:26-cv-03626 (D.D.C. Oct. 16, 2026), ECF No. 1 .......... 10

Federal Prosecution of Election Offenses (Richard C. Pilger ed., 8th ed. 2017) .. 8-9

Jose Pagliery, *The Justice Department Had 36 Lawyers Fighting Corruption Full-Time. Under Trump, It's Down to Two.*, The Washington Sun (Sep. 22, 2025), https://perma.cc/459L-2FRD .......... 10

Statement of Interest of United States, *Colorado Montana Wyoming State Area Conference of the NAACP v. United States Election Integrity Plan*, No. 1:22-cv-00581 (D. Colo. Jan. 3, 2023), ECF No. 74 .......... 3-5

Statement of Interest of United States, *League of Women Voters of New Hampshire v. Kramer*, No. 1:24-cv-00073 (D.N.H. July 25, 2024), ECF No. 86 .......... 3-5, 7

Statement of Interest of United States, *League of Women Voters of Arizona v. Lions of Liberty LLC*, No. 3:22-cv-08196 (D. Ariz. Oct. 31, 2022), ECF No. 17 .......... 5-7

Statement of Interest of United States, *National Coalition on Black Civic Participation v. Wohl*, No. 1:20-cv-08668 (S.D.N.Y. Aug. 12, 2022), ECF No. 235 .......... 5

Statement of Interest of United States, *United States v. Alabama*, No. 2:24-cv-01329 (N.D. Ala. Oct. 9, 2024), ECF No. 27 .......... 2, 4

Stephanie Berger & Regan Rush, *Inside DOJ's Election Monitoring Program, Past and Present*, Red Line for Civil Rights (Sep. 29, 2026), https://perma.cc/XFG3-DTKJ....................................................................10

United States Brief Defending the Interpretation of Section 11(b) of the Voting Rights Act, *Fair Fight v. True the Vote, Inc.*, No. 2:20-cv-00302 (N.D. Ga. Jan. 17, 2023), ECF No. 192........................................................................... 5-6

*Voting Rights Act of 1965: Hearing Before the House Committee On the Judiciary*, 89th Cong. (1965) (statement of Nicholas Katzenbach, Attorney General of the United States), https://perma.cc/N9S4-KH2P .....................................................6

## INTEREST OF *AMICUS CURIAE*[1]

Justice Connection provides direct support to the Department of Justice's ("DOJ") current and former apolitical career workforce. As a network of DOJ alumni, it connects current and recent employees with pro bono legal representation, mental health counseling, whistleblower assistance, FBI support, employment help, coaching, and media support. It also advocates for the integrity of DOJ's mission-critical work and speaks out in defense of the rule of law. Justice Connection operates as an independent 501(c)(3) organization. Its team of staff and advisors include former prosecutors, civil litigators, judges, FBI agents and analysts, and national security experts, who served in components across DOJ, under both Republican and Democratic administrations. Its DOJ Alumni Network—comprising thousands of former DOJ and FBI employees—includes many who enforced election integrity and voting rights laws at the Department. Justice Connection submits this brief because it has a direct interest in ensuring that DOJ's law

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), *Amicus Curiae* Justice Connection states that no counsel for a party authored this brief in whole or in part, and no person or entity, other than *Amicus* and its counsel, made a monetary contribution to the preparation or submission of the brief. In accordance with Federal Rule of Appellate Procedure 29(a)(2), *Amicus Curiae* Justice Connection submits this brief without a motion for leave to file because all parties before the Court in this proceeding consented to its filing.

enforcement work remains apolitical and lawful, and that DOJ and other federal law enforcement agencies are held accountable when it is not.

## INTRODUCTION

In its role enforcing Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b) (hereinafter "Section 11(b)"), the United States has recognized that the statute "is to be given an expansive meaning." *See, e.g.*, Statement of Interest of U.S. at 4, *United States v. Alabama*, No. 2:24-cv-01329 (N.D. Ala. Oct. 9, 2024), ECF No. 27 (quoting *Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979)). Until now, the United States consistently argued that Section 11(b) includes a private right of action; does not require a showing of intent; can reach and proscribe abuses of law enforcement authority and law enforcement tactics; and often calls upon courts to determine—based on a totality of the circumstances—whether typically authorized or lawful activities have been undertaken in an unlawful manner or to achieve unlawful ends. Consistent with this understanding of the law and the important concerns animating it, in the past, the federal government voluntarily adopted policies and practices that carefully limited federal law enforcement activities around elections to minimize the risk of voter intimidation and undue interference in ongoing elections.

This Administration, however, has set aside these well-supported interpretations of federal law and its historically restrained approach to law

enforcement near elections. These decisions were appropriately regarded with skepticism by the district court, which issued a narrow injunction preventing the Administration from continuing its unprecedented and irresponsible election-related law enforcement activities in the week preceding an important federal election. This Court should deny Defendants-Appellants' Motion.

## ARGUMENT

### I. The United States' interpretation of Section 11(b) is inconsistent both with its past enforcement and with the statute's text, context, and precedent.

In its past enforcement actions, the United States has recognized Section 11(b) affected a "broad prohibition against intimidation, threats, and coercion." Statement of Interest of U.S. at 4, *League of Women Voters of N.H. v. Kramer*, No. 1:24-cv-00073 (D.N.H. July 25, 2024), ECF No. 86; *see also* Statement of Interest of U.S. at 1, *Colo. Mont. Wyo. State Area Conf. of the NAACP v. U.S. Election Integrity Plan*, No. 1:22-cv-00581 (D. Colo. Jan. 3, 2023), ECF No. 74 (arguing that "Section 11(b) comprehensively prohibits voter intimidation"). Defendants-Appellants nevertheless argue that Section 11(b) lacks a private right of action, covers only intimidation effectuated "because of" a person's protected voting activities, and permits any law enforcement activities undertaken by the federal government under the auspices of some executive or statutory authority. But in advancing these constructions of Section 11(b), the United States has abandoned careful positions it

has repeatedly embraced in its prior enforcement work in favor of arguments that lack colorable support in statutory text, context, and precedent, as explained in prior briefs and Statements of Interests (SOI).

First, the United States has repeatedly exercised the authority granted to it under 28 U.S.C. § 517 to intervene in private litigation to submit Statements of Interest urging courts to uphold Section 11(b)'s private right of action and "ensur[e] the proper interpretation of Section 11(b)." U.S. SOI at 1, *Kramer*, ECF No. 86; *see, e.g.*, U.S. SOI at 1, *Alabama*, ECF No. 27; U.S. SOI at 1, *U.S. Election Integrity Plan*, ECF No. 74. In these cases, the United States grounded its arguments in the text of the statute—arguments that directly contradict those raised for the first time in this case, *compare* U.S. SOI at 7 n.2, *Kramer*, ECF No. 86, *with* U.S. Br. at 18-19—and highlighted that nearly every court to consider this question has found a private right of action. The United States also explained that declining to find a private right of action in Section 11(b) would undermine the statute's purpose, given the "limited federal resources available to enforce the Voting Rights Act." U.S. SOI at 13, *U.S. Election Integrity Plan*, ECF No. 74. Today, no changes in law or facts provide reason or justification for this radical reversal in federal position.

The same holds for the United States' changed position on whether Section 11(b) includes a specific intent requirement. *See* U.S. Br. at 19–20 (asserting that Section 11(b) only prohibits intimidating those engaging in protected voter

mobilization and assistance *because* they are doing so). Until now, the United States had universally argued that Section 11(b) does not require any showing of specific intent; rather the legal analysis should be focused on the impact of the challenged actions not the motivations behind them. *See, e.g.*, U.S. Br. Defending the Interpretation of Section 11(b) of the Voting Rights Act at 9–13, *Fair Fight v. True the Vote, Inc.*, No. 2:20-cv-00302 (N.D. Ga. Jan. 17, 2023), ECF No. 192; Statement of Interest of the U.S., *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 1:20-cv-08668 (S.D.N.Y. Aug. 12, 2022), ECF No. 235. "[D]efendants [are] deemed to intend the natural consequences of their acts." U.S. SOI at 5, *U.S. Election Integrity Plan*, ECF No. 74 (quoting *Voting Rights Act of 1965: Hearing Before the H. Comm. On the Judiciary*, 89th Cong. 12 (1965) (statement of Nicholas Katzenbach, Att'y Gen. of the U.S., author of the Voting Rights Act), https://perma.cc/N9S4-KH2P ("Katzenbach Statement")). Nothing here accounts for the sea change in the United States' interpretation of well-settled federal law.

Moreover, the United States has consistently explained that law enforcement-like tactics, such as interrogations, surveillance, or threats of legal consequences, can constitute intimidation under Section 11(b). *E.g.*, U.S. SOI at 5–8, *League of Women Voters of Ariz. v. Lions of Liberty LLC*, No. 3:22-cv-08196 (D. Ariz. Oct. 31, 2022), ECF No. 17; U.S. SOI at 12, *Kramer*, ECF No. 86. These kinds of tactics as well as other "formal governmental processes" can exacerbate intimidating effects

because these actions "carry the official imprimatur of the state" and "can raise the specter of administrative difficulties and . . . adverse legal consequences." U.S. Br. at 18, *Fair Fight*, ECF No. 192. The United States has long recognized that in many such cases "courts are often called upon to determine when otherwise lawful activities are being used for unlawful ends." *Id.* at 18. The fact that a defendant may have undertaken the challenged activities pursuant to some plausible statutory or executive authority, then, is far from dispositive in assessing whether those actions violate Section 11(b). As the Department explained:

> [C]ompliance with state law and procedure is not sufficient to inoculate otherwise unlawful voter challenges from liability under Section 11(b), contrary to Defendants' suggestion. Defs.' Br. at 12. Section 11(b) was designed to provide a remedy against government officials and others who weaponized state law to intimidate and coerce voters with conduct ranging from baseless arrests and prosecutions to abuse of voter registration laws, challenges, and purges.

*Id.* at 19 n.9; *see also* Katzenbach Statement at 8–9 (highlighting the failure of predecessor statutes to address voter intimidation by government officials). These arguments have also come up in cases related to private poll monitoring, a practice ordinarily authorized by law. U.S. SOI at 7, *Lions of Liberty LLC*, ECF No. 17. But courts have found that the right to observe polling places is not unlimited and must yield when the manner in which a person undertakes these activities becomes intimidating, threatening, or coercive. The same logic applies to misuse of law enforcement authority and investigatory tactics.

In determining whether such activities run afoul of 11(b), the United States and courts emphasized holistic analysis is required. Relevant factors, according to the United States, include whether the challenged activities are occurring close in time or place to elections and whether they would subject individuals to public scrutiny or opprobrium. *Id.* at 7; U.S. SOI at 18, *Kramer*, ECF No. 86. 11(b) claims regarding threats of adverse legal action are even more colorable when such conduct is undertaken by someone with actual power. The United States has routinely cited its own enforcement actions under other voter intimidation provisions to support these arguments. *See, e.g.*, U.S. SOI at 4, *Lions of Liberty LLC*, ECF No. 17 (citing *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965); *United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012)).

## II. The challenged practices are inconsistent with longstanding government policy and practice related to law enforcement activities around elections.

The federal government has long recognized that abuses of law enforcement power and irresponsible use of law enforcement tactics can give rise to unlawful voter intimidation, coercion, and threats or otherwise interfere in ongoing elections. Consistent with that understanding, the federal government historically embraced a careful and restrained law enforcement approach around elections to minimize the risk that federal law enforcement activities will harm voters or otherwise interfere in the democratic process. The policies challenged here run contrary to this well-founded approach.

The federal government's historical embrace of the view that caution is required when it comes to election-related law enforcement activities during ongoing elections is most apparent in two places: (1) the policies regulating criminal investigations and prosecutions outlined in the Department of Justice's Federal Prosecution of Election Offenses Manual ("the Manual"); and (2) the Civil Rights Division's prior internal practices related to information gathering and election monitoring at polling places that supported civil enforcement of federal election laws.

*First*, the Manual formalized policies that were expressly designed to mitigate the risks of voter intimidation and coercion that might come from election-related law enforcement activities. To begin, the Manual emphasized that the federal government's role is *not* prevention or intervention, but prosecution *after* crimes have occurred—again—in part to protect voters and safeguard the democratic process.[2] For example, the Manual explains that, for election fraud matters, "in most cases voters should not be interviewed, or other voter-related investigations done, until after the election is over" because "[s]uch overt investigative steps may chill legitimate voting activities."[3] To mitigate even the risk of intimidation, the DOJ discouraged any investigations into election irregularities while voting is underway

---

[2] Federal Prosecution of Election Offenses 8 (Richard C. Pilger ed., 8th ed. 2017) ("Federal Prosecution of Election Offenses Manual").
[3] *Id.* at 11.

because such investigations—even preliminary ones—"run[] the obvious risk of chilling legitimate voting and campaign activities."[4] The Manual further requires special authorization for operations conducted near or around polling locations during ongoing elections, cautioning that even covert operations risk chilling lawful voting activity.[5]

Given the sensitivities and risk of harm from election-related enforcement actions, many election-related investigatory actions required review, approval, or consultation with election-crime prosecutors in DOJ's Public Integrity Section ("PIN"). For example, while the FBI and U.S. Attorneys Offices could conduct "preliminary investigations" into election crimes without consultation, "preliminary investigation[s]" did not allow them to "interview[] voters during the pre-election or balloting periods concerning the circumstances under which they voted, as such interviews have the potential to interfere with the election process or inadvertently chill the exercise of an individual's voting rights."[6] Overt criminal investigations were directed to occur after the election and any preliminary fact gathering was to be done discreetly because of the perception of such investigations by voters and the public at large.[7] Anything beyond a preliminary investigation required approval

---

[4] *Id.* at 16, 84.
[5] *Id.* at 119–20.
[6] *Id.* at 16.
[7] *Id.* at 11–12.

from PIN. But these safeguards do not appear to be in place here. While investigations of election crimes have long been the purview of DOJ—specifically PIN and the FBI, who were bound by the DOJ policies described above—Homeland Security Investigations was rarely if ever involved. The Administration has also crippled PIN, reducing it from 36 attorneys to around just two, leaving no internal constraints or checks on investigative activity related to election crimes.[8]

*Second*, the Civil Rights Division structured its election monitoring program—one of the primary investigatory and information gathering apparatuses on the civil enforcement side—to minimize the risk it would intimidate voters. Most notably, the Civil Rights Division previously exclusively relied on civil staff to support its election monitoring program, and declined to allow criminal prosecutors, investigators, and others who supported criminal work to participate in these efforts.[9] This choice was designed to ensure that the individuals who were present during ongoing elections lacked the authority to charge someone with a crime, because the presence of someone with such a power could be intimidating. *Cf. Burson v. Freeman*, 504 U.S. 191, 207 (1992) (recognizing state statutes barring law

---

[8] *See* Jose Pagliery, *The Justice Department Had 36 Lawyers Fighting Corruption Full-Time. Under Trump, It's Down to Two.*, The Wash. Sun (Sep. 22, 2025), https://perma.cc/459L-2FRD.

[9] *See* Compl. at 4, *NAACP v. Blanche*, No. 1:26-cv-03626 (D.D.C. Oct. 16, 2026), ECF No. 1; Stephanie Berger & Regan Rush, *Inside DOJ's Election Monitoring Program, Past and Present*, Red Line for C.R. (Sep. 29, 2026), https://perma.cc/XFG3-DTKJ.

enforcement officers "from the vicinity of the polls to avoid any appearance of coercion in the electoral process"). Federal election monitors were also trained to minimize any intrusion at polling sites, including by only approaching voters with questions about their experience after they finished voting and left the polling place.

The challenged policies run contrary to the aforementioned exercise of caution around election-related law enforcement. Here, on the eve an election, the district court found Defendants-Appellants are conducting full scale investigations by sending armed agents door-to-door questioning individuals—including some eligible voters—regarding their voter eligibility and past electoral activity, and widely publicizing arrests related to these investigations. Add. 4, 13, Br. of Pls.-Appellees, Dkt. 10.1. Defendants-Appellants have put forward no evidence suggesting urgency to these investigations—which are apparently related to registration data, including from "unreliable" commercial data, not the ongoing election—or factual predication that such full-scale investigations are warranted. The fact that DOJ policy long cautioned against or proscribed law enforcement operations of this nature evidences how the district court's narrow injunction, applicable only for the next six days, risks little harm to other significant government interests in protecting our democratic system by ensuring the election is free and fair.

## CONCLUSION

For the above reasons, *Amicus* Justice Connection urges the Court to deny Defendants-Appellants' Emergency Motion for Immediate Administrative Stay and Stay Pending Appeal.

Dated: October 28, 2026

Respectfully submitted,

*/s/ Bruce Spiva*
Bruce Spiva
Dana Paikowsky
Alice C.C. Huling
Rachel Appel
**CAMPAIGN LEGAL CENTER**
1333 New Hampshire Ave. NW
Suite 300
Washington, DC 20036
(202) 736-2200
bspiva@campaignlegalcenter.org
dpaikowsky@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
rappel@campaignlegalcenter.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 2,594 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in 14-point Times New Roman Font.

*/s/ Bruce Spiva*
Bruce Spiva