**No. 26-7139**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

CALIFORNIA NURSES ASSOCIATION, *et al.*,
Plaintiffs-Appellees,

v.

MARKWAYNE MULLIN, *et al.*,
Defendants-Appellants.

On Appeal from the United States District Court for the Northern District of California

# REPLY IN SUPPORT OF EMERGENCY MOTION FOR IMMEDIATE ADMINISTRATIVE STAY AND STAY PENDING APPEAL

BRETT A. SHUMATE
*Assistant Attorney General*
CRAIG H. MISSAKIAN
*United States Attorney*
ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
GABRIEL I. SCHONFELD
*Attorneys, Appellate Staff*
*Civil Division, Room 7219*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3306*

# TABLE OF CONTENTS

**Page**


INTRODUCTION .................................................................................... 1

ARGUMENT ........................................................................................ 3

I. Plaintiffs Lack Standing ........................................................... 3

II. Plaintiffs' Voting Rights Act Claims Fail on the Merits .................. 6

III. The Injunction Does Not Comply With Rule 65 ............................. 11

IV. The Equities Decisively Favor a Stay ............................................ 12

CONCLUSION ...................................................................................... 15

CERTIFICATE OF COMPLIANCE

## INTRODUCTION

Plaintiffs undoubtedly disagree strongly with how DHS is investigating voters whom it suspects may be noncitizens. But their opposition makes little effort to connect those complaints—and the injunction the district court issued—to the legal claims asserted here. Plaintiffs urge that DHS is targeting naturalized citizens for investigation despite having incomplete or inaccurate information about their citizenship status. But this is a case under a Voting Rights Act provision that prohibits intimidating or harassing individuals who assist or encourage others to vote. And plaintiffs' alleged injuries relate to their decision to cease engaging in activities of that kind, or to change the method by which they intend to vote, neither of which has any evident connection to the conduct of which they complain.

These errors pervade plaintiffs' analysis and are sufficient for a stay pending appeal, but there is more. Section 11(b) of the Voting Rights Act does not create a private right of action. Aside from citing some district-court cases that mistakenly suggest otherwise, plaintiffs retreat to the curious and counter-textual argument that Section 11(b),

which does not require state action, somehow enforces the Fourteenth and Fifteenth Amendments.

In addition, the injunction issued by the district court is vague, causing it to be erroneous on the merits and create significant harm. This entire controversy—or at least the one plaintiffs have put before the Court—is about the degree to which the government is doing enough to confirm citizenship status before conducting interviews that are meant to confirm citizenship status. The district court nonetheless issued an injunction that applies to investigations that "involve or are likely to involve" individuals whom the government "should reasonably . . . suspect" are U.S. citizens. The district court was not entitled to essentially assume away the entire controversy and address any uncertainties on the back end in the context of a contempt proceeding. The government should not be required to labor under this improper injunction in the days before the midterm election, and a stay pending appeal should be granted.

## ARGUMENT

### I. Plaintiffs Lack Standing

Plaintiffs do not urge that there is any government policy that would require investigating their members, but rather that those members are likely to be targeted by accident because the government is unaware that they are naturalized citizens. In addition to having little to do with the injunction they are defending—which relates only to individuals whom the government has reason to believe are citizens—that contention ignores that no investigation is automatic. This case thus bears no resemblance to *Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025), where a county was compelled to take action if it had "reason to believe" that a voter was not a citizen, a policy that threatened to sweep in individuals as to which data was inconclusive. *Id.* at 708. Here, there is no such requirement and DHS does not rely on any such standard or on the results of a single data source.

In *Vasquez Perdomo v. Noem*, 148 F.4th 656 (9th Cir. 2025), this Court held that the government did not dispute on appeal that there was "a pattern of conduct that ha[d] apparent official approval" that plaintiffs alleged was unlawful, *id.* at 672, that one of the plaintiffs had

been stopped twice in just 10 days, and that the government "sent teams to the same place repeatedly," *id.* at 674-75. The government does not concede here that it engages in an officially approved pattern of targeting people it should know are citizens but as to whom it has no basis for suspicion of unlawful voting or registration before naturalization, *see* Stay Mot. 15 n.5—quite the contrary—and there is no comparable evidence that plaintiffs' members are likely to be subject to the investigations that they fear.

In any event, even putting aside the dispute about the likelihood that plaintiffs will be targeted for investigation, the harms they allege are plainly self-inflicted. Plaintiffs assert that DHS is identifying individuals on the voter rolls who they suspect to be noncitizens, and attempting to resolve discrepancies in the data by questioning registered voters. Even if plaintiffs' members were likely to be subject to these interviews, nothing about them suggests that plaintiffs should refrain from "electoral engagement," or that they "are compelled to vote by mail." Opp'n 8. Plaintiffs' need to rely on these voluntary steps that have little to do with the challenged conduct, and thus on injuries that

the injunction does not redress, underscores the absence of any concrete and cognizable injury that would be sufficient to establish standing.

Finally, perhaps perceiving the weakness of the standing theory on which the district court relied, plaintiffs urge this Court to accept a claim of standing rejected by the district court. Even assuming that a distinct standing theory—and thus distinct irreparable harm—could justify affirming the district court's equitable determination to issue a preliminary injunction, their argument is mistaken on its own terms. Plaintiffs allege that "DHS is searching for organizations facilitating unlawful voter registration or voting activity to initiate prosecutions." Opp'n 12 (quotation marks omitted). That has nothing whatsoever to do with the injunction plaintiffs defend here. And to the extent that plaintiffs urge that Voto Latino's voter-mobilization operations are made more difficult by DHS's actions toward third parties not before the court, the Supreme Court has established that plaintiffs cannot spend their way to standing by engaging in voluntary activities to attempt to address injuries allegedly suffered by others. *See generally Arizona Alliance for Retired Americans v. Mayes*, 186 F.4th 622, 643-46

(9th Cir. 2026) (en banc) (Bress, J., concurring in part and concurring in judgment in part); *see also id.* at 635 (majority reserving this issue).

## II. Plaintiffs' Voting Rights Act Claims Fail on the Merits

Plaintiffs read Section 11(b) of the Voting Rights Act of 1965—which expressly commits enforcement to the Attorney General and prohibits only intimidation "for" protected conduct, 52 U.S.C. § 10307(b)—as a sweeping, privately enforceable ban on any law-enforcement activity that incidentally discourages voter mobilization. That is wrong twice over.

**1.** The text of the Voting Rights Act precludes any finding that Section 11(b) is privately enforceable. As the government has explained, *see* Stay Mot. 17-19, the Voting Rights Act contains implied private rights of action (at most) as to provisions enacted under Congress's power to enforce the Fourteenth and Fifteenth Amendments, and Section 11(b) does not fit the bill. Plaintiffs' responses are unavailing.

Plaintiffs are wrong, at the outset, to claim that Section 11(b) is enforceable "under *Gonzaga University v. Doe*, 536 U.S. 273 (2002)."[1]

[1] More puzzling still is Plaintiffs' claim that *Gonzaga*'s relevance here is "well-established" within this Circuit, Opp'n 16, based on a

*Continued on next page.*

*Gonzaga* considers the circumstances under which a federal statute creates rights enforceable against state officers via the express cause of action found in 42 U.S.C. § 1983. *Gonzaga*, 536 U.S. at 274. It does not address the "different inquiry" that applies in considering "whether a private right of action can be implied from a particular [federal] statute." *Id.* The Court need not determine whether Section 11(b) creates a private *right*, because the statutory text clearly precludes a private *remedy*. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but *also* a private remedy." (emphasis added)).

Plaintiffs are wrong on the remedy-creation point, too. There is no "vast caselaw" supporting private enforcement of Section 11(b), Opp'n 17, only a handful of district-court decisions that have misapplied the statutory text and governing Supreme Court precedents. Stay Mot. 18-19. Plaintiffs' assertion, unsupported by any analysis, that Section 11(b) enforces the Fourteenth and Fifteenth Amendments is both

---

single district-court decision that does not cite *Gonzaga* at all, *see Arizona Alliance for Retired Americans v. Clean Elections USA*, 638 F. Supp. 3d 1033 (D. Ariz. 2022).

curious on its face (since the provision requires neither state action nor a showing of discrimination) and belied by all statutory evidence contemporaneous with its enactment. When Congress meant to base a Voting Rights Act provision on its authority to enforce those provisions, it said so expressly. *See, e.g.*, 52 U.S.C. § 10306; *Morse v. Republican Party of Virginia*, 517 U.S. 186, 233-34 (1996) (finding § 10306 privately enforceable because it was "by its terms . . . designed for enforcement of the . . . Fourteenth and Fifteenth Amendments."). It unsurprisingly did not do so for Section 11(b), which is not targeted at state action but instead to conduct in which any private individual could engage. The supporting committee report accordingly stated expressly that Section 11(b) is authorized by the Elections Clause of Article I. H.R. Rep. 89-439 (1965), as reprinted in 1965 U.S.C.C.A.N. 2437, 2462.

Plaintiffs' remaining arguments on this point are of little moment. The fact that Section 11(b)'s *substantive prohibitions* apply to "person[s], whether acting color of law or otherwise," Opp'n 17 (quoting

52 U.S.C. § 10307(b)),[2] says nothing about who is entitled to *enforce* those provisions. And whatever relevance cases authorizing private enforcement as a matter of "inherent equitable" authority might have where Congress has enacted statutory text that is *silent* on private enforcement, *see* Opp'n 18, they have no purchase here. The Voting Rights Act expressly assigns enforcement of Section 11(b) to the Attorney General, 52 U.S.C. § 10308, and Congress has expressly recognized that *some* provisions of the Act are privately enforceable in terms that exclude Section 11(b), Stay Mot. 18-19. That is more than enough to show that Congress "intended to preclude" private enforcement here. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 328-29 (2015).

**2.** Even if plaintiffs could privately enforce Section 11(b), they still have not shown a likelihood of success on that claim. Contrary to the main focus of plaintiffs' opposition, the government is not arguing that law-enforcement activity can never amount to intimidation or generate objectively reasonable fear. *Cf.* Opp'n 12-14. Nor is the

[2] The Court need not decide whether "person," as used in Section 11(b), includes federal agents.

government arguing that persons are somehow immune from Section 11(b) liability if they are acting pursuant to legal authority. *Cf.* Opp'n 14-15; 52 U.S.C. § 10307(b) (expressly applying to persons "acting under color of law").

Rather, plaintiffs' claims fail for an entirely different reason—there is no evidence whatsoever that they are subject to intimidation "for" their protected voter mobilization activities. Stay Mot. 19-21. Plaintiffs do not dispute this fundamental shortcoming as a factual matter. Rather, they argue that the government's position would re-create in Section 11(b) a "purpose" requirement found in a voter-intimidation provision of the Civil Rights Act of 1957. Opp'n 14 (discussing differences between Section 11(b) and 52 U.S.C. § 10101(b)). Although Congress deleted the word "purpose" from Section 11(b), the parallel provision of the 1965 Act, it did not delete the word "for." *See For*, Black's Law Dictionary (1968 ed.) ("for" means "because of," "on account of," or "in consequence of"). Congress' decision to enact 11(b) without a requirement of "*subjective* purpose or intent," H.R. Rep. 89-439 (1965) (emphasis added), as reprinted in 1965 U.S.C.C.A.N. 2437, 2462, does not mean it intended to enact a prohibition applicable to any

conduct that affects voter mobilization, however attenuated or (as here) non-existent an objective causal connection there may be between the intimidating conduct and the activities meant to be protected.

## III. The Injunction Does Not Comply With Rule 65

Plaintiffs likewise fail to address the mismatch between their assertions of harm and the injunction they obtained, rendering the government's obligations hopelessly confused. Plaintiffs' fundamental allegation is that the government is targeting voters without adequately determining whether they are noncitizens. But plaintiffs defend an injunction that applies to operations that "involve or are likely to involve"—whatever that means—"persons whom the Enjoined Parties, know, suspect, or should reasonably know or suspect are U.S. citizens." Order 18. Given that plaintiffs' whole point is that the government is not doing enough to determine whether individuals are citizens, there is no principled way to apply that injunction.

Plaintiffs' reliance on cases in which the entire controversy was not about how certain the government needed to be before taking action is entirely misplaced. Of course in some circumstances the government applies legal standards about "reason to believe" or "reasonable

suspicion." Opp'n 19. But here, the government has no intention of taking the challenged actions if it actually believes an individual to be a citizen, so the district court's order amounts to judicial second-guessing, under penalty of contempt, of the degree to which the government should have had better information. And by arguing, in the alternative to resisting any injunction at all, that any injunction should be limited to operations "directed at individuals whom the agency knows or reasonably should know to be a U.S. citizen," Opp'n 19 (quoting ECF 46, at 37), the government did not somehow invite the district court to issue an injunction relating to what the government could "reasonably . . . suspect," or about individuals that an investigation might somehow "involve," or even to issue an injunction that mirrored the words the government advanced as an alternative but ultimately resisted in its entirety. *See* PI Op. 18.

## IV. The Equities Decisively Favor a Stay

The preliminary injunction inflicts harm on the government that is both significant and irreparable: A federal law enforcement agency, in possession of information identifying persons who may have violated federal election law, has been enjoined from taking basic investigative

steps that are "integral" to "nearly all voter fraud investigations." Declaration of James C. Harris ¶ 12, ECF No. 90-1; Stay Mot. 23-25.[3] Making matters worse, the injunction is written in terms so inscrutably broad that DHS may conclude that the only certain way to avoid contempt is to halt lawful inquiries of anyone who cannot, in advance, be "conclusively verif[ied]" as an alien—exactly the question an investigative interview is supposed to answer. *See id.* ¶ 10. That is classic irreparable harm. *Trump v. CASA, Inc.*, 606 U.S. 831, 859-60 (2025); *Tincher v. Noem*, 164 F.4th 1097, 1100 (8th Cir. 2026) (per curiam). Plaintiffs are incorrect to suggest that there is no exigency justifying immediate relief—the government is investigating unlawful voting and voter registration, and a nationwide election is only days away.

Plaintiffs' main response is to urge that the injunction is not universal, that they do not regard these enforcement operations as important, and that the injunction only prohibits unlawful conduct. As

[3] Plaintiffs assert that the Harris declaration should be ignored because it was not written prior to the preliminary injunction being issued. Opp'n 2 n.1. It is difficult to understand how DHS officials could have explained under oath the irreparable harms of an injunction that did not yet exist.

to the first two points, although the irreparable harm in *Trump v. CASA* happened to relate to an impermissibly universal injunction, the Supreme Court's more general point was that any injunction preventing the Executive Branch from carrying out the laws imposed irreparable harm. *See* 606 U.S. at 861 ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quotation marks and brackets omitted)). And the second point merely rehashes their erroneous view that the injunction is sufficiently clear that it will not chill lawful conduct.

Plaintiffs' countervailing claims of harm largely hinge on injuries that are not at issue here. Even apart from plaintiffs' errors in assessing the degree to which lawful voters will be impermissibly targeted, the activities at issue here (and those ostensibly germane to plaintiffs' purpose) are mobilization efforts, and neither the injunction nor the DHS conduct at issue in this case has much to do with those.

Finally, plaintiffs' complaint about the speed (less than a week) with which the government sought a stay ignores that plaintiffs allege that the challenged conduct began at the beginning of September, but did not expeditiously pursue their claims. In addition to not filing a

preliminary-injunction motion right away, plaintiffs challenged the adequacy of the administrative record and proposed a schedule under which the preliminary-injunction hearing would not occur until the middle of October. The last-minute nature of this dispute is largely of plaintiffs' making.

## CONCLUSION

The Court should enter an immediate administrative stay and stay the preliminary injunction pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

CRAIG H. MISSAKIAN
*United States Attorney*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
*s/ Gabriel I. Schonfeld*
GABRIEL I. SCHONFELD
*Attorneys, Appellate Staff*
*Civil Division, Room 7219*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3306*
*gabriel.i.schonfeld@usdoj.gov*

October 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of this Court's Rule 27-1 and 32-3 because it contains 2,740 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Gabriel I. Schonfeld*
Gabriel I. Schonfeld