**No. 26-7139**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

CALIFORNIA NURSES ASSOCIATION, *et al.*,
Plaintiffs-Appellees,

v.

MARKWAYNE MULLIN, *et al.*,
Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of California

# APPELLANTS' SUPPLEMENTAL BRIEF

BRETT A. SHUMATE
*Assistant Attorney General*

CRAIG H. MISSAKIAN
*United States Attorney*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
GABRIEL I. SCHONFELD
*Attorneys, Appellate Staff*
*Civil Division, Room 7219*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3306*

## INTRODUCTION

The district court entered a legally baseless and hopelessly vague preliminary injunction that arrogates to the court the power to superintend, upon pain of contempt, the manner in which the Executive Branch conducts investigations of criminal activity regarding unlawful voting by noncitizens shortly before a federal election. The panel's order denying a stay ignored the speculative nature of plaintiffs' alleged harm, disregarded the mismatch between the alleged harm and the injunction actually issued, did not even address whether the injunction was entered in error, and gave short shrift to the dramatic intrusion on the prerogatives of a coordinate branch of government. The Court should grant rehearing en banc and issue an immediate stay.

## ARGUMENT

The panel addressed only three issues: (1) whether CNA has shown associational standing, (2) whether the government has shown irreparable harm, and (3) whether the preliminary injunction is sufficiently clear to satisfy Federal Rule of Civil Procedure 65. In addition to getting those issues wrong, the panel did not even address the serious merits defects in the district court's order, discussed in our

briefing: the district court was entirely mistaken to hold that the Voting Rights Act creates a private right of action and that plaintiffs could establish that government investigations into illegal voting constitute intimidation of voters for carrying out voter-mobilization activities. Such an intrusive injunction cannot properly be promised on such a thin legal theory, and en banc review is warranted to correct the panel's errors.

**1.** To establish associational standing, CNA must show that for at least one of its members, the challenged action threatens a cognizable injury in fact, such that the member "would otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The panel, like the district court, was mistaken to hold that this requirement was satisfied. *See* Panel Op. 7-13.

Although CNA identifies four members from whom its standing purportedly derives, each one presents the same basic facts: The member is a naturalized citizen, ECF No. 10-1 ¶¶ 20, 30, 41; ECF No. 78-1 ¶ 16, who is generally "aware" that DHS is investigating persons it "believes are non-citizens" who have voted or registered to vote, ECF

No. 10-1 ¶¶ 23, 32; ECF No. 78-1 ¶ 18; *see* ECF No. 10-1 ¶ 42. They fear that in the course of those investigations DHS might mistake them for a noncitizen. ECF No. 10-1 ¶¶ 24, 36, 44; *see* ECF No. 78-1 ¶ 19. They fear in turn that if DHS mistakes them for a noncitizen, then they might be interviewed or detained. ECF No. 10-1 ¶¶ 24, 33, 44; ECF No. 78-1 ¶¶ 19-20. As a result of these fears, they have stopped engaging in election-related conduct such as attending political rallies, participating in campaign events, and serving as a poll monitor. ECF No. 10-1 ¶¶ 26, 37; ECF No. 78-1 ¶ 21.[1]

As the government has explained, *see* Stay Mot. 12-17, Stay Reply 3-6, this falls well short of establishing standing, as any future adverse government action is highly speculative. The Supreme Court has squarely held that a plaintiff's fear of harm, and efforts to avoid that harm, are not themselves a basis for standing. *See Clapper*, 568 U.S. at 415-16. Instead, a plaintiff must demonstrate that the harm itself is (or at least would be but for the plaintiff's efforts) "certainly impending." *Id.*

[1] Citations to "ECF No. __" refer to materials filed in the district court.

Plaintiffs have not made that showing here. They do not assert that DHS has targeted them or will ever target them intentionally. Instead, they fear that DHS will target them by *mistake*—either a mistake regarding identity or one related to citizenship status. But they offer no reason to believe that such a mistake is certainly impending with respect to any of the four members CNA identifies to support its standing.

The panel decision primarily emphasized that CNA's members have stopped engaging in election-related activities in which they would otherwise participate because they fear encountering law enforcement who may be mistaken as to their citizenship or identity. Panel Op. 9. That is exactly the error that the Supreme Court corrected in *Clapper*, where the Court squarely held that such self-inflicted harm is constitutionally sufficient only to the extent that it is taken in response to an external one that is certainly impending. *See Clapper*, 568 U.S. at 415-16. And the only harm asserted here—encountering law enforcement based on a *mistake*—does not fit the bill.

This Court's decisions in *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708-09 (9th Cir. 2025), and *Vasquez Perdomo v. Noem*, 148 F.4th

656, 674-76 (9th Cir. 2025) (per curiam), upon which the panel chiefly relied, are not to the contrary. *Cf.* Panel Op. 10-11. *Mi Familia* involved a state statute that *required* county recorders to periodically "conduct citizenship checks of registered . . . voters" who they had "reason to believe" are not citizens. *Mi Familia*, 129 F.4th at 705. Voters flagged in such checks were, in turn, subject to *mandatory* cancellation of registration if they were not subsequently "confirmed to be citizens." *Id.* And in *Vasquez Perdomo*, the government did not dispute on appeal that there was "a pattern of conduct that ha[d] apparent official approval" that plaintiffs alleged was unlawful. 148 F.4th at 672.

Here, by contrast, there is plainly no statutory requirement or official policy mandating that DHS make the mistakes that plaintiffs assert may lead to law enforcement encounters. Indeed, as the government has explained, *see* Stay Mot. 15-16, a database-matching error of the type addressed in *Mi Familia* could manifest in a field interview (if at all) only following failures at multiple stages of DHS's layered vetting process to filter out U.S. citizens. The key feature of the facts this Court held gave rise to standing in *Mi Famila* and *Vasquez Perdomo*—a legal mandate or official policy requiring the government to

inflict the injuries plaintiffs fear—is entirely absent here, where plaintiffs at bottom sue based on the bare possibility that they will be interviewed by mistake. The fact that plaintiffs know more (relative to the policy at issue in *Clapper*) about the initiative that might lead to such a mistake does nothing to increase the likelihood that one will occur and cause injury. *Cf.* Panel Op. 11-13.

The panel offered two additional bases for standing, neither of which can rescue plaintiffs' suit. Relying on unsubstantiated claims that DHS "surveils, covertly infiltrates, and interrogates the staff of non-profits and churches conducting voter engagement," Panel Op. 10, the panel surmised that plaintiffs had established an increased likelihood that they would be targeted as well. But CNA's members do not assert that they participate in "voter engagement" work conducted by "non-profits [or] churches." *Cf. id.* Rather, they allege that they wish to attend political rallies and campaign events, and to serve as poll monitors. ECF No. 10-1 ¶¶ 26, 37; ECF No. 78-1 ¶ 21. Whatever claim to standing a member of a voter-engagement group subject to infiltration and surveillance might have, that is far afield from what CNA's members claim here. And this claim to standing in any event has

nothing to do with the injunction at issue here, which prohibits investigations that involve people that the government should reasonably suspect are U.S. citizens and not the sorts of targeting of voter mobilization discussed by the panel.

Nor does the fact that reasonable fear is *one* element of a claim under Section 11(b) of the Voting Rights Act, *but see* Stay Mot. 19-21 (explaining that fear, in the abstract, does not make out a claim under Section 11(b)); Stay Reply 10-11 (same), suffice to make *any* fear of injury, no matter how remote, an injury-in-fact for constitutional purposes. On the panel's theory, the *Clapper* plaintiffs would have had standing if they had brought a tort suit based on claims that their fear of surveillance was causing them emotional distress. That is simply not the law.

**2.** The panel likewise gravely erred in assessing the government's irreparable harm. The panel decision was largely premised on the extraordinary view that the government suffers no irreparable harm if a district court oversees the way the government conducts investigations of unlawful voting immediately before an election. Panel Op. 16. The panel treated the government's harms as "speculative,"

even as it simultaneously held that plaintiffs had standing on the ground that they were likely to be interviewed by the government in the absence of an injunction. *Id.* The panel apparently faulted the government for failing to lay out its precise investigative plans—an extraordinary burden—or detail exactly how the district court's vague injunction might be used against federal officials in the future. *See id.* at 16-17.

The panel highlighted the error in its analysis by relying on a brief from former law-enforcement officials, who "detail[ed] how the Federal Defendants can still choose to employ a range of less intrusive, and still effective, mechanisms to pursue unlawful voting." Panel Op. 17. The court's apparent view that the government suffers no irreparable harm if a court substitutes the views about how to investigate violations of federal law of certain nonfederal officials for the views of the people charged with investigating those laws cannot be reconciled with the fundamental premise of representative government. *See Trump v. California*, Nos. 26A124 and 26A139, slip op. at 8 (U.S. Aug. 24, 2026) (per curiam) (granting a stay of a district court's

injunction because that injunction "interfere[d] with the internal operations of the Executive Branch.").

The panel's criticism of the timing of the federal government's activities, in addition to once again usurping the role of the Executive Branch in making enforcement decisions, ignores that noncitizens who have voted illegally in the past are likely to do so again such that enforcement in the runup to the election can both gather evidence of ongoing illegal activity and help to prevent it. The government would not need to "prosecute anyone they could identify before Election Day," Panel Op. 18, to carry out these important functions. And even if courts disagree with the government's preferred means of enforcing federal law, it is implausible to suggest that the federal government suffers no irreparable harm when it is inhibited from exercising its own preferences. *See Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025).

**3.** Finally, the panel essentially failed to grapple with the government's argument that the injunction was impermissibly vague, contributing to the chill of lawful operations in addition to rendering the injunction unlawful on the merits. As the government made clear (Stay Reply 11-12), the government was not arguing that an injunction

could never involve scienter requirements like “reason to believe.” *But see* Panel Op. 22. The problem here is that the government has no intention of taking the challenged actions if it actually believes an individual to be a citizen, so the district court’s order amounts to judicial second-guessing, under penalty of contempt, of the degree to which the government should have had better information. This case is not fairly analogized to cases in which the controversy was about what actions the government could take with a certain quantum of evidence, rather than about whether the government was right or wrong in evaluating the evidence. And by arguing, in the alternative to resisting any injunction at all, that any injunction should be limited to operations “directed at individuals whom the agency knows or reasonably should know to be a U.S. citizen,” ECF 46, at 37, the government did not somehow invite the district court to issue an injunction relating to what the government could “reasonably . . . suspect,” or about individuals that an investigation might somehow “involve,” or even to issue an injunction that mirrored the words the government advanced as an alternative but ultimately resisted in its entirety. *See* ECF 46, at 18.

## CONCLUSION

For the foregoing reasons and the reasons given in the government's previous filings, the full Court should immediately enter a stay pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

CRAIG H. MISSAKIAN
*United States Attorney*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN

*s/ Daniel Tenny*

DANIEL TENNY
GABRIEL I. SCHONFELD
*Attorneys, Appellate Staff*
*Civil Division, Room 7219*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3306*
*gabriel.i.schonfeld@usdoj.gov*

October 2026

## CERTIFICATE OF COMPLIANCE

The Court did not impose a word limit for this supplemental brief, but the brief contains 2009 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Daniel Tenny*
Daniel Tenny