**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

OCT 30 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

CALIFORNIA NURSES ASSOCIATION; NATIONAL NURSES UNITED; COUNTY OF SANTA CLARA; VOTO LATINO FOUNDATION; CITY AND COUNTY OF SAN FRANCISCO,

Plaintiffs - Appellees,

v.

MARKWAYNE MULLIN; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA; ANTHONY SALISBURY; RODNEY S. SCOTT; THOMAS HOMAN; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendants - Appellants.

No. 26-7139

D.C. No.
4:26-cv-10680-AMO
Northern District of California, Oakland

ORDER

Before: S.R. THOMAS, Senior Circuit Judge and En Banc Coordinator.
Dissent by Judge TUNG.

A judge of this Court sua sponte requested a vote on whether the panel's October 30, 2026, order should be reheard en banc. A majority of the nonrecused

active judges did not vote in favor of rehearing en banc. Accordingly, en banc proceedings with respect to the panel's order are concluded.

FILED

OCT 30 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*California Nurses Association v. Mullin*, No. 26-7139

TUNG, Circuit Judge, joined by CALLAHAN, NELSON, COLLINS, BRESS, BUMATAY, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

More than a century ago, Justice Holmes warned that "accident[s] of immediate overwhelming interest . . . exercise a kind of hydraulic pressure," causing "even well settled principles of law [to] bend." *N. Sec. Co. v. United States*, 193 U.S. 197, 400–01 (1904) (Holmes, J., dissenting). It is hard to think of a more fitting example than the preliminary injunction issued in this case. By enjoining the government from even *investigating* illegal voting, the district court departed from its limited role—and trampled on the President's in the process. And by relying on section 11(b) of the Voting Rights Act (VRA), Pub. L. 89-110, § 11(b), 79 Stat. 437, 443 (1965) (codified at 52 U.S.C. § 10307(b)), it confused investigation for intimidation.

Congress prohibited noncitizens from voting. *See* 18 U.S.C. § 611(b); *see also* 8 U.S.C. §§ 1182(a)(10)(D), 1227(a)(6). And Article II gives the President—not the Judiciary—"'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Trump v. United States*, 603 U.S. 593, 620 (2024) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)). The district court here installed itself as a super-executive responsible for deciding when investigations are *really* in the public interest. *Cf. Jay Burns Baking Co. v. Ryan*, 264 U.S. 504, 534 (1924) (Brandeis, J.,

dissenting). "Federal courts do not exercise general legal oversight of the . . . Executive Branch[]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). The "discretion of the Executive Department . . . cannot be controlled by the Judiciary." *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 436 (1899).

The district court also trivialized the wrongs the VRA sought to right. For much of American history, voter intimidation ran rampant. *See Burson v. Freeman*, 504 U.S. 191, 200–04 (1992) (plurality opinion). The problem worsened in the wake of the Fifteenth Amendment: "Almost immediately following Reconstruction, blacks attempting to vote were met with coordinated intimidation and violence." *Nw. Aus. Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 218–19 (2009) (Thomas, J., concurring in the judgment in part and dissenting in part). One mayoral candidate suggested that, if voters found a black person in their ranks, they should "tell him to leave the polls, and if he refuses kill him; shoot him down in his tracks." *Id.* (citation omitted). Congress designed section 11(b) to put an end to this violence. It does so by prohibiting intimidation, coercion, and threats to would-be voters or those who urge or assist others to vote. *See* 52 U.S.C. § 10307(b).

Investigations of suspected voter fraud have nothing in common with the intimidation section 11(b) forbids. The latter is evil; the former good. "The counting of unlawful votes . . . erodes public confidence that the election results reflect the

people's will." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 78 (2026). Accordingly, "[t]here is no question about the legitimacy or importance of the [government's] interest in counting only the votes of eligible voters," *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality opinion). Equating investigations of unlawful voting with intimidation of lawful voters minimizes our sordid history of violence and intimidation.

Despite these fundamental flaws in the district court's analysis, the panel left the injunction in place. That was a mistake, and it is one we should have acted quickly to correct. I respectfully dissent.

## I.

### A.

Only American citizens may vote in federal elections. An alien who votes in a federal election faces up to a year in prison, 18 U.S.C. § 611(b), as well as serious immigration consequences, *see* 8 U.S.C. §§ 1182(a)(10)(D), 1227(a)(6). An alien who falsely claims to be a citizen to vote faces even stiffer penalties, including up to five years in prison. 18 U.S.C. § 1015(f). In March 2025, President Donald J. Trump issued an executive order directing the Executive Branch to "prioritize enforcement" of these laws using various databases and other records. Exec. Order No. 14248, § 2(e), 90 Fed. Reg. 14005, 14007 (Mar. 25, 2025).

Department of Homeland Security (DHS) then implemented a two-step process for investigating potential noncitizen voting. At the first step, United States Citizenship and Immigration Services (USCIS) identifies potential illegal voters by comparing voter data obtained from a variety of sources (including both information supplied by various state and local governments and publicly available information) against DHS and commercial databases. Dist. Ct. ECF 46-1 (USCIS Decl.) ¶¶ 9–10. After identifying potential illegal voters, USCIS manually reviews the records to determine whether the evidence supports referring the potential unlawful voting to Homeland Security Investigations (HSI). *Id.* ¶ 19. The goal is to "exclude any United States Citizens from further review." *Id.* ¶ 10. If USCIS concludes that an individual likely voted illegally, it creates a TECS record[1]for that individual. Dist. Ct. ECF 10-7 at 23.

When HSI receives a referral from USCIS, it decides whether to investigate further. Dist. Ct. ECF 46-2 (HSI Decl.) ¶ 18. If HSI determines that further investigation is warranted, it sends an investigative lead to one of its field offices. *Id.* ¶ 22. The field office then independently assesses the records (often in consultation with the local U.S. Attorney's Office) before deciding what investigative action to take—if any. *Id.* Among the records the field office consults

---

[1] TECS formerly stood for "Treasury Enforcement Communication System," but is no longer used as an acronym. **Motion at 7 n.3.**

are the TECS records created by USCIS, but field offices never rely solely on TECS records. *Id.* ¶ 20. One step it may take is a field interview with the potential illegal voter. *See id.* ¶ 22.

B.

On September 18, 2026, three organizations—the California Nurses Association, National Nurses United Together, and the Voto Latino Foundation—and two municipalities—the City and County of San Francisco and the County of Santa Clara—sued DHS, several of its subagencies, and various federal officials. They alleged that DHS's investigations violated section 11(b) of the VRA, which prohibits "intimidat[ing], threaten[ing], or coerc[ing], or attempt[ing] to intimidate, threaten, or coerce any person for voting or attempting to vote" or "for urging or aiding any person to vote or attempt to vote." On October 21, the district court granted Plaintiffs a preliminary injunction. *See Cal. Nurses Ass'n v. Mullin* (*Cal. Nurses Ass'n I*), No. 26-cv-6080-AMO, 2026 WL 3166149 (N.D. Cal. Oct. 21, 2026).

Although the district court concluded that neither the Voto Latino Foundation nor the municipalities had standing, it ruled that the California Nurses Association and National Nurses United Together (collectively, "the Association") likely have associational standing because "at least four U.S. citizen members . . . fear being wrongly identified, surveilled, targeted, investigated, forced into coercive

encounters with HSI, and detained" as a result of DHS's investigations. *Id.* at *6; *see id.* at *5–6. It went on to conclude that the Association has a private right of action to enforce section 11(b) and that DHS's investigations violate section 11(b) by intimidating voters. *Id.* at *7–9. Finally, it ruled that the Association suffered irreparable harm and that the equities do not favor the government. *Id.* at *9–10.

On this basis, the district court issued a sweeping injunction. It prohibited the government from "[c]onducting elections-related field operations and field interviews . . . that involve or are likely to involve persons" whom the government "know[s], suspect[s], or should reasonably know or suspect are U.S. citizens" in nine states (California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin). *Id.* at *10. It also blocked the government from "[c]onducting elections-related field operations" in the same nine states "based wholly on" the TECS records generated by USCIS against persons whom the government "know[s], suspect[s], or should reasonably know or suspect are U.S. citizens." *Id.*

The government appealed the preliminary injunction and sought a stay pending appeal. *See* ECF 8.1 (Motion). While that motion was pending before the panel, the district court declined to issue its own stay pending appeal. Dist. Ct. ECF 92. Subsequently, the panel denied the stay. *Cal. Nurses Ass'n v. Mullin* (*Cal. Nurses Ass'n II*), ___ F.4th ___, 2026 WL 3268397, at *1 (9th Cir. Oct. 30, 2026)

(per curiam). The panel first agreed that the Association had standing to seek this injunction on behalf of its members. *Id*. at 9. And it denied a stay because the government failed to prove irreparable harm. *Id*. at 15–22.

II.

"To secure a stay pending appeal, the Government must show [1] that it is likely to succeed on the merits and [2] that it is likely to suffer irreparable harm without a stay." *Trump v. California*, 609 U.S. 1032, 1034 (2026) (per curiam). "It must also demonstrate [3] that the balance of equities does not counsel against relief." *Id.*

III.

The government is likely to succeed on the merits of its appeal for at least three reasons. *First*, the Association lacks standing to challenge the government's investigative practices. *Second*, Plaintiffs' claims fail on the merits—private parties cannot enforce section 11(b), and in any event the government's investigations do not violate section 11(b). *Finally*, the injunction is both vague and overbroad.

A.

Article III standing requires plaintiffs to prove (1) injury in fact, (2) traceability, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. "At the

preliminary injunction stage . . . the plaintiff[s] must make a clear showing" that they are "likely to establish standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

Associational standing does not relax these requirements. The Association seeks to establish associational standing on behalf of four of its members. Dist. Ct. ECF 10-1 ¶¶ 20, 30, 41; Dist. Ct. ECF 78-1 ¶ 16. To do so, it must prove that its members have standing to sue in their own right. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). And it must *also* prove that (1) the interests it seeks to protect are germane to its purpose, and (2) neither the claim nor the relief requested requires the individual members' participation. *Id.* The Association falters at the first step: at this stage of the litigation, it has not made a clear showing that any of its members have likely suffered an injury in fact.

The Association argues that its members are threatened with a future injury—namely, being wrongfully investigated for voter fraud. It also argues that its members are suffering a present injury from the costs they have incurred to mitigate that threatened future injury. The Supreme Court has "repeatedly reiterated that [a] 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (citation omitted). In *Clapper*, the plaintiffs asserted that the threat of government surveillance required them to avoid online communications, message only in generalities, and travel to meet

contacts in-person to protect their confidentiality. *Id.* at 415. The plaintiffs had no actual knowledge of the government's targeting practices. *Id.* at 411. Nor did they set forth specific facts supporting that their communications would be targeted. *Id.* at 412. They instead "assume[d]" that their communications would be intercepted and took mitigation measures "in light of that assumption." *Id.* at 411. The Court held that the plaintiffs failed to establish that their fears were "certainly impending." *Id.* at 416. So even if plaintiffs "incurred certain costs as a reasonable reaction to a risk of harm," they failed to establish standing because the harm they sought to avoid was a mere "speculative threat." *Id.*

*Clapper* controls. The Association's members rely on their own self-inflicted harm—*they* made the decision to "stop[] attending and participating in election related campaign events" based on their fear of coercive encounters with federal agents. Dist. Ct. ECF 10-1 ¶¶ 26, 37; Dist. Ct. ECF 78-1 ¶ 21. But the object of this fear is not "certainly impending"; nor is there a "substantial risk" that harm will occur. *Clapper*, 568 U.S. at 414 n.5. The Association offers no evidence that its members have been or will be targeted by the government. And it provides no reason why enforcement against them is even likely. Instead, it argues that its members fear that the government *might* mistake them for noncitizens or for citizens who voted prior to naturalization, and that if the government does so, they *might* be interviewed or detained. Dist. Ct. ECF 10-1 ¶¶ 24, 33, 36, 44; Dist. Ct. ECF 78-1 ¶¶ 19-20.

Federal courts may not rest jurisdiction on a "chain of causation" so "attenuated." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 391 (2024).

The panel's attempt to distinguish *Clapper* runs headlong into *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). The panel contends that the plaintiffs in *Clapper* speculated about the government's actions, whereas here Plaintiffs have documented a fear of harm "that has already begun happening to people like them."[2] *Cal. Nurses Ass'n II*, ___ F.4th at ___, 2026 WL 3268397, at *5. But in *Lyons*, the Court acknowledged that even if some "citizens of . . . Los Angeles" experienced "certain instances" of the challenged conduct, that possibility was not sufficient for the *individual* plaintiff to show standing. 461 U.S. at 108. Indeed, Lyons himself was subject to the exact conduct he sought to enjoin. *Id.* at 105. It is hard to imagine someone more "like" a plaintiff than the plaintiff himself. Yet Lyons's own experience did not "establish a real and immediate threat" that he would be subject to that same conduct once again. *Id.*; *see also Ashcroft v. Mattis*, 431 U.S. 171, 171–172 & n.2 (1977) (per curiam) (rejecting as insufficient the likelihood that the plaintiff's son would be subjected to deadly force even when the plaintiff's other son

[2] The Association points to no evidence that the government has run field operations against naturalized citizens, presumably the people "like them" the panel refers to. *Cal. Nurses Ass'n II*, ___ F.4th at ___, 2026 WL 3268397, at *5. This challenge, then, is a "pre-enforcement challenge" after all—not only have the Association's members not been subject to any adverse action—there is no evidence that anyone has been subject to the precise harm the members worry they will suffer.

was shot and killed by police). As *Lyons* demonstrates, that some "like" the Association's members have had encounters with DHS does not demonstrate that those members are likely to have such encounters. *Cf. Murthy*, 603 U.S. at 59 ("[P]ast injuries are relevant only for their predictive value.").

Moreover, DHS's vetting process renders these fears speculative. Both USCIS and HSI would have to miss the citizen in their respective reviews. Even if certain sources that these agencies rely upon are "unreliable," *Cal. Nurses Ass'n I*, 2026 WL 3166149, at *2, the Association has failed to prove that the process as a whole is so faulty that its members will likely be flagged, or such a dragnet that its members, if flagged, will suffer some adverse action. Absent such proof, the members lack an injury in fact.

Even if it could be said that investigation of the Association's members is certainly impending, those members' self-inflicted harms would not be "reasonably incur[red] . . . to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5. No evidence suggests that their voter-engagement efforts would have made the members any more likely to encounter federal agents—or, on the flip side, that abstaining from such efforts has made such encounters any less likely. On the contrary, if the lists of potential investigatory targets are created using databases of voter information, it is hard to see *how* staying home would play any role in avoiding an investigation. The field interviews appear to occur almost exclusively at targets' homes, so getting out

the vote should not invite increased risk of an interview. *See, e.g.,* Dist. Ct. ECF 10-7 at 135 (X post including a photo of an HSI officer approaching a target's home); *id.* at 140 (same); Dist. Ct. ECF 79-11 (X post including a video of same).

The panel does not rely on Supreme Court precedent in concluding that there is standing. Rather, the panel relies on two precedents of this Court: one is pending review in the Supreme Court this Term, and the other denied a request for a stay that the Supreme Court later granted. *See Cal. Nurses Ass'n II*, ___ F.4th at ___, 2026 WL 3268397, at *4 (citing *Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026), and *Vasquez Perdomo v. Noem*, 148 F.4th 656 (9th Cir. 2025), *stay granted*, 606 U.S. 1026 (2025)). Even if these precedents were correct, *but see*, *e.g.*, *Mi Familia Vota*, 129 F.4th at 764–65 (Bumatay, J., dissenting); *Vasquez Perdomo*, 606 U.S. at 1028–29 (Kavanaugh, J., concurring), they are inapposite.

In *Mi Familia Vota*, we confronted an Arizona law that required county recorders to conduct citizenship checks of any registered voter they had "reason to believe" was not a citizen. 129 F.4th at 705. The "mere and potentially arbitrary suspicion of a county recorder" triggered the citizenship check. *Id.* at 708. Here, a potential target undergoes multiple independent reviews before any field operation. HSI Decl. ¶ 12. And even if a registered voter is flagged as a noncitizen, field officers have discretion whether to investigate. *Id.* ¶¶ 21-22. Whether a plaintiff has

standing on the facts of *Mi Familia Vota* says nothing about whether a plaintiff faces a certainly impending threat or a substantial risk of harm here.

Nor is *Vasquez Perdomo* comparable. There, each of the plaintiffs had previously been stopped by federal agents as part of the challenged operation. 148 F.4th at 673. The record showed that the government repeatedly sent agents to the same place. *Id.* at 675. We therefore concluded that the threat federal agents would return to the same location and confront the plaintiffs again was not speculative, but "real and immediate." *Id.* By contrast here, the Association's members allege no prior confrontations with federal agents as part of the challenged operation. *Vasquez Perdomo* is distinguishable.

B.

Even if the Association had standing, its claims would fail on the merits for two independent reasons. *First*, section 11(b) does not create a private right of action, nor can it be enforced through a general suit in equity. *Second*, even if private parties could sue to enforce section 11(b), Plaintiffs' claim would fail because investigating potential voter fraud does not violate section 11(b)'s prohibition on voter intimidation.

1.

Plaintiffs asked the district court to read a cause of action into section 11(b) of the VRA. The district court should have refused. "Congress, not the Judiciary,

decides who may enforce the law." *FS Credit Opportunities v. Saba Capital Master Fund, Ltd.*, 608 U.S. 609, 611 (2026). Private parties may sue to enforce a statute only if Congress created *both* a private right and a private remedy. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Section 11(b) does not impart any private right. And it grants sole enforcement power to the Attorney General. *See* 52 U.S.C. § 10308(d).

Start with the right. "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 688 (1979). At minimum, we refuse to read private rights into statutory provisions that contain no "rights-creating language" addressing "particular class[es] of persons." *Sandoval*, 532 U.S. at 288–89 (internal quotation marks omitted); *see FS Credit Opportunities*, 608 U.S. at 614. We look for language "phrased in terms of the persons benefited," *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (citation omitted), not language restricting a regulated party, *Sandoval*, 532 U.S. at 289.

Section 11(b) begins by addressing the regulated parties—any "person, whether acting under color of law or otherwise." 52 U.S.C. § 10307(b). It then outlines a pattern of conduct—intimidation, threats, and coercion—that exposes that

person to liability. *Id.* This language does not read like a rights-creating provision; it reads like a regulation of conduct.[3]

Nor does section 11(b) come with a private remedy. If Congress provided an express remedial scheme, that language may "foreclose a private cause of action." *Sandoval*, 532 U.S. at 289. "When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional . . . remedies." *See Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988). Congress implicitly foreclosed a private right of action under section 11(b). The VRA is a "complex scheme" with a careful system of rights and remedies. *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966). When crafting that scheme, Congress provided a single remedy for a section 11(b) violation—civil enforcement by the Attorney General. *See* 52 U.S.C. § 10308(d).

Plaintiffs' counterarguments do not change this fact. True, certain members of the Supreme Court once readily assumed private rights of action under certain provisions of the VRA. For example, in *Morse v. Republican Party of Virginia*,

[3] Other language in the VRA supports this reading. Sections 12(a) and 12(c) provide criminal penalties for violations of rights "secured" under the VRA but make no mention of section 11(b). *See generally* Michael T. Morley, *Section 12 as a Guide to Private Rights of Action and § 1983 Claims Under the Voting Rights Act*, 120 Nw. L. Rev. Online 164 (2026).

517 U.S. 186 (1996), an opinion by Justice Stevens (joined by Justice Ginsburg) assumed that sections 2, 5, and 10 authorized private rights of action despite the availability of civil enforcement actions by the Attorney General. *See, e.g.*, *id.* at 231–32 (opinion of Stevens, J.); *see also id.* at 240 (Breyer, J., concurring in the judgment). Justice Stevens relied on the VRA's "contemporary legal context" of federal courts reading implied rights of action into silent statutes. *See Morse*, 517 U.S. at 231 (opinion of Stevens, J.) (quoting *Cannon*, 441 U.S. at 699). But to start, *Morse* has little bearing because it did not address the provision at issue here (section 11(b)). More importantly, the Supreme Court no longer takes such a loose approach of inferring rights of action on the basis of "contemporary legal context." Rather, now, "legal context matters *only* to the extent it clarifies text." *Sandoval*, 532 U.S. at 288 (emphasis in original); *see also Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1215–16 (8th Cir. 2023) (describing *Morse*'s inconsistency with modern precedents on implied rights of action). And here, the text makes clear that no private right of action exists under section 11(b).

Plaintiffs' backup argument fares no better. Plaintiffs invoke federal courts' authority to award injunctive relief "to prevent an injurious act by a public officer." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (quoting *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845)); *see Ex parte Young*, 209 U.S. 123 (1908). But "[t]he power of federal courts of equity to enjoin unlawful executive

action is subject to express *and implied* statutory limitations." *Armstrong*, 575 U.S. at 328 (emphasis added). Congress can impliedly foreclose private equitable remedies by creating an express statutory enforcement scheme. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). Here, the "sole remedy" for a section 11(b) violation is civil enforcement by the Attorney General. *Armstrong*, 575 U.S. at 328. By creating that singular enforcement scheme, Congress limited the judicial power to adjudicating cases brought under that scheme. *See Seminole Tribe*, 517 U.S. at 75; *Armstrong*, 575 U.S. at 328; *see also Ark. United v. Thurston*, 146 F.4th 673, 679 (8th Cir. 2025) (denying equitable relief because section 208 of the VRA "has its own enforcement structure").

2.

Even if Plaintiffs *could* enforce section 11(b) via a private right of action, they cannot do so here. There are at least two defects in the district court's conclusion that the government violated the VRA.

*First*, section 11(b) does not apply to the United States. The statute bars a "person, whether acting under color of law or otherwise," from engaging in voter intimidation. 52 U.S.C. § 10307(b). This statute has a broad scope—it "covers both public and private actors." *Colo. Mont. Wyo. State Area Conf. of the NAACP v. Smith*, 180 F.4th 1266, 1280 (10th Cir. 2026). But "[i]n the absence of an express statutory definition," we apply a "longstanding interpretive presumption that

'person' does not include the sovereign." *Return Mail, Inc. v. USPS*, 587 U.S. 618, 626 (2019) (citation and internal quotation marks omitted). And "[n]oninclusion of the sovereign means noninclusion of agencies of the sovereign as well." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 44, at 274 (2012).[4]

The closest the statute comes to overcoming that presumption is its reference to persons acting "under color of law." 52 U.S.C. § 10307(b). This bare phrase does not "*affirmatively* show[] Congress intended" to regulate the United States itself. *Return Mail*, 587 U.S. at 629 (emphasis added). Indeed, the statute's express enforcement mechanism, civil action by the Attorney General, supports the presumption. *See* 52 U.S.C. § 10308(d). We should thus adhere to the "longstanding interpretive presumption that 'person' does not include" the federal government. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000).

*Second*, Plaintiffs cannot show a likely violation of the statute. Congress banned persons from "intimidat[ing], threaten[ing], or coerc[ing], . . . any person *for* voting or attempting to vote," or "*for* urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b) (emphasis added). "For" in this context means "[b]y

[4] Nominally, the defendants here are a variety of federal officials and agencies rather than the United States itself. But those officials are sued in their official capacities, and "an official-capacity suit is, in all respects other than name . . . a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

reason of" or "because of." *For*, Black's Law Dictionary (rev. 4th ed. 1968) (quotation omitted). The statute thus requires *some* causal link between the intimidation and the protected activity. *See Lapham v. Walgreen Co.*, 88 F.4th 879, 890–91 (11th Cir. 2023) (a statutory ban on employer retaliation against an employee "*for* opposing any practice made unlawful" imposed a but-for causation standard (citation and internal quotation marks omitted) (emphasis in original)).

True, the statute does not include a subjective "purpose" requirement. As Plaintiffs point out, the voter intimidation provision in the Civil Rights Act of 1957 contains such an element. *See* 52 U.S.C. § 10101(b) (banning intimidation "for the purpose of interfering with the right of such other person to vote or to vote as he may choose"); ECF 10.1 (Resp.) at 14. Congress omitted that requirement from the VRA intentionally. *See* Scalia & Garner, *supra*, § 25 at 170 ("a material variation in terms suggests a variation in meaning"). But cause does not equal intent.

Plaintiffs failed to establish cause. Nowhere do they explain how their protected activities caused the alleged intimidation. All the record evidence proves is that the government planned to "identify[] unlawful voter activity" and "support[] criminal and administrative enforcement actions." ECF 50-2 at 2. The Executive Branch has authority to conduct such investigations, and the Department of Homeland Security has exercised that authority for some time. HSI Decl. ¶ 8.

Plaintiffs do not even attempt to establish that the specific operations of which they disapprove had an unlawful but-for cause.

The district court did no better. It defined the "core analysis" for section 11(b) as "whether the activities have generated fear that is objectively reasonable." *Cal. Nurses Ass'n I*, 2026 WL 3166149, at *8 (citation, alteration, and internal quotation marks omitted). And it concluded that a collection of federal activities could cause Plaintiffs' members "reasonable fear" in "assisting and mobilizing voters." *Id.* at *9. But the district court never answered whether the government undertook the allegedly intimidating actions *because of* Plaintiffs' members' voter mobilization activities. Instead, it opted for a looser requirement: the government violates the statute if people who "wish to mobilize, educate and assist voters" experience some enforcement-related fear. *Id*. at *8. This approach replaces the statutory ban on intimidation "for voting" with a ban on intimidation "around voting," as though *any* actions causing fear among voters or political organizations violate the statute—no matter why they were undertaken. That construction, on which Plaintiffs' theory depends, transforms the statute into a wide-ranging ban on doing nearly anything around an election. Any criminal enforcement activity causes fear among voters—police patrols might convince voters to stay home or discourage campaigners from door-knocking. Neither the district court nor Plaintiffs point to any principle which could exclude that result.

*　*　*

Section 11(b) does not reach the United States. Even if it did, the United States did not violate its prohibitions. Plaintiffs are therefore unlikely to succeed on the merits of their VRA claim.

C.

Even if Plaintiffs were likely to succeed on the merits, the injunction is dramatically overbroad. It effectively prohibits the government from conducting *any* election-related investigations in nine states. Under the injunction, the government must cease field operations and interviews "that *involve* or are *likely to involve*" persons that they "know, suspect, or *should reasonably* know or *suspect* are U.S. citizens." *Cal. Nurses Ass'n I*, 2026 WL 3166149, at *10.

Such sweeping language runs afoul of Federal Rule of Civil Procedure 65, which requires that injunctions have specific terms and describe the restrained acts in "reasonable detail." Fed. R. Civ. P. 65(d)(1)(B)–(C). This rule is not a "technical" requirement; it protects enjoined parties who risk being found in contempt for violating an incomprehensible order. *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Contempt is a "potent weapon" and, when based on a "decree too vague to be understood, it can be a deadly one." *Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

This injunction flunks Rule 65. The injunction's terms are too vague for federal agents to distinguish between permissible and impermissible conduct. The injunction covers "elections-related field operations," but it does not explain what counts as a "field operation." *Cal. Nurses Ass'n I*, 2026 WL 3166149, at *10. Interviewing a suspected illegal voter seems to qualify, but what about interviewing a suspected illegal voter's friends, family, or coworkers? Reviewing social media posts? Documenting investigative findings? The injunction does not say. As a result, agents lack sufficient notice of what conduct will subject them to contempt. *Compare Melendres v. Skinner*, 113 F.4th 1126, 1140 (9th Cir. 2024) (injunction listing specific directives is not vague), *with Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026) (injunction directing government not to retaliate against peaceful protesters is vague).

The injunction is also overbroad. Injunctions "must be narrowly tailored to remedy the specific harm shown." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (per curiam) (internal quotation marks omitted). This injunction bans the government from engaging in legal activity. The ban on pursuing investigations "likely to involve" citizens implicates scores of investigations. So does the requirement that the government avoid investigating those it "should . . . reasonably suspect" are citizens. Suspect means "[t]o consider (something) possible; [t]o consider (a person) as having probably committed wrongdoing, but

without certain truth." *Suspect*, Black's Law Dictionary (12th ed. 2024). By banning the government from acting if it has a reason to suspect citizenship, the district court raised the burden of the injunction yet higher. The government may not investigate unlawful voting if it involves someone the government should think "*might*" be a citizen. *United States v. Lambert*, 184 F.4th 1273, 1277 (11th Cir. 2026) (emphasis in original) (interpreting the statutory phrase "reason to suspect"). Here, if the government has *any* reason to believe that an individual *might* be a U.S. citizen, he is immune from investigation. Coupling "suspect" with "likely to involve," it is practically impossible for the government to continue lawful investigations into noncitizen voting without the looming threat of contempt.[5]

In essence, the district court created a reverse reasonable-suspicion requirement that bars investigation unless the government is *certain* that the

---

[5] The panel's attempts to salvage the injunction's defects fail. *First*, the panel claims that this court has upheld "injunctions with similar scienter requirements," citing *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020). *Cal. Nurses Ass'n II*, ___ F.4th at ___, 2026 WL 3268397, at *8. But the injunction there was far more limited than the one at issue here: in *Index*, the district court enjoined actual arrests, threats to arrest, and the use of physical force against any person whom [the officers] "know or reasonably should know" is a journalist. 977 F.3d at 841 n.3 (O'Scannlain, J., dissenting). Here, the order enjoins federal defendants from conducting any "interview[]" likely to "involve" people whom the federal defendants "reasonably suspect" are citizens. Clearly, to threaten arrest or use force is not to "interview"; and to "know" is not to "suspect." The analogy is fatuous. *Second*, the panel notes that the injunction is "time limited." *Cal. Nurses Ass'n II*, ___ F.4th at ___, 2026 WL 3268397, at *7. So what? A time-limited injunction does not cure an injunction's vagueness or its overbreadth. While the injunction is in effect, the government still faces threat of contempt.

individual is not a U.S. citizen. In its natural habitat, "reasonable suspicion" is a low bar that permits officers to act to protect the public. *See United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) ("The reasonable-suspicion standard is not a particularly high threshold to reach."). When reversed, it becomes a high bar preventing the government from conducting any investigations into unlawful election activity. Even a search backed by a warrant (and supported by probable cause) could run afoul of the injunction. After all, probable cause to suspect illegal voting can exist even when an officer suspects that the vote was cast legally. *See Florida v. Royer*, 460 U.S. 491, 507 (1983) (plurality opinion) ("[T]he fact that the officers did not believe there was probable cause . . . would not foreclose the State from . . . proving probable cause . . . .").

The injunction prevents many investigations not barred even by Plaintiffs' VRA theory. An unpublicized investigation into a noncitizen who plans to unlawfully vote would pose no voter intimidation problems. But DHS cannot do it if it is not certain he is not a citizen.

The injunction's scope also exceeds the district court's equitable authority. That authority extends *only* to "administer[ing] complete relief *between the parties*." *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (emphasis in original) (internal quotation marks omitted). The injunction here is broader and more burdensome than necessary to do that. *See id.* at 852. The injunction spans nine states—six named in

the record as part of DHS's enforcement campaign and three more identified from media reports. Motion at 10–11. And it applies to non-parties. *Cf. L.A. Press Club v. Noem*, 171 F.4th 1179, 1191 (9th Cir. 2026) (a preliminary injunction prohibiting the government from firing tear gas or grenades at "any person" was overbroad because it was not limited to providing relief to the individual plaintiffs, members of the organizational plaintiffs, or non-parties whose protection was necessary to give relief to the plaintiffs). *CASA* forbids injunctions of such enormous scope. *See CASA*, 606 U.S. at 861. Federal courts do not "exercise general oversight of the Executive Branch," and our authority is limited to resolving the cases before us. *See id.* The district court's failure to heed the limits on its equitable authority is an independent reason the government is likely to succeed on appeal. *See id.* at 841 ("The Government is likely to succeed on the merits of its argument regarding the scope of relief.").

IV.

The remaining factors—irreparable harm and the balance of the equities—also warrant a stay.

A.

The government unquestionably suffers irreparable harm from the district court's injunction. *First*, the injunction exceeded the district court's authority under Article III and the Judiciary Act of 1789. That alone "is enough to justify interim

relief." 606 U.S. at 859. Puzzlingly, the panel said otherwise, relying on circuit precedent holding that any "institutional injury" from "erosion of the separation of powers . . . is not irreparable." *Cal. Nurses Ass'n II*, ___ F.4th at ___, 2026 WL 3268397, at *6 (quoting *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam)). But we may not follow our previous decisions when they are clearly irreconcilable with later Supreme Court decisions. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). And on at least three subsequent occasions, the Supreme Court has expressly held that such harms *are* irreparable. *See CASA*, 606 U.S. at 859; *California*, 609 U.S. at 1041; *Nat'l Park Serv. v. Nat'l Tr. for Hist. Pres. in the U.S.*, 609 U.S. 1068, 1073 (2026) (per curiam). That should have been enough for the panel to take the hint. "When a federal court 'improperly intrudes on a coordinate branch' in this way, interim relief is justified"—full stop. *California*, 609 U.S. at 1041 (quoting *CASA*, 606 U.S. at 859); *see Nat'l Tr. for Hist. Pres.*, 609 U.S. at 1073 (finding irreparable harm because "[t]he district court likely exceeded its Article III authority to enjoin the activities of a coordinate branch of government"); *Immigr. & Naturalization Serv. v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers).

*Second*, the government suffers irreparable injury from its inability to enforce federal law. "As the [Supreme] Court has indicated, any time that the government is enjoined by a court from effectuating statutes enacted by representatives of its

people, it suffers a form of irreparable injury." *Vasquez Perdomo*, 606 U.S. at 1030 (Kavanaugh, J., concurring) (internal brackets and quotation marks omitted) (quoting *CASA*, 606 U.S. at 861); *see Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). The panel responds that "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Cal. Nurses Ass'n II*, ___ F.4th at ___, 2026 WL 3268397, at *6 (internal quotation marks omitted). But once again, the panel relies on a proposition the Supreme Court has expressly (and repeatedly) rejected. *See CASA*, 606 U.S. at 859–60 (repudiating the dissent's position "that a stay applicant cannot demonstrate irreparable harm from a threshold error without also showing that, at the end of the day, it will prevail on the underlying merits"); *California*, 609 U.S. at 1041 (same). Indeed, the panel makes an argument identical to those made by the dissenting justices. *See CASA*, 606 U.S. at 892–94 (Sotomayor, J., dissenting); *California*, 609 U.S. at 1051 (Jackson, J., dissenting). A majority of the Supreme Court, by contrast, described this position as "[f]ighting [the Supreme] Court's precedent." *California*, 609 U.S. at 1041 (majority opinion). "As a court of appeals, we are not free to adopt the views of the dissenters and reject those of the majority of the Supreme Court." *United States v. Silverman*, 861 F.2d 571, 586 (9th Cir. 1988) (Wallace, J., dissenting); *see Nat'l Insts. of Health v. Am.*

*Pub. Health Ass'n*, 606 U.S. 998, 1002 (2025) (Gorsuch, J., concurring in part and dissenting in part).

Even if, contrary to unambiguous (and recent) Supreme Court precedent, enjoining an unlawful practice could not inflict irreparable harm, the panel's argument works only if the practice was in fact unlawful. But the panel does not discuss the legality of the investigations at issue here. And for good reason: on this record, they have not been proven unlawful.

Relatedly, the panel argues that the government is not irreparably harmed because it can continue investigating voter fraud by other means. *Cal. Nurses Ass'n II*, ___ F.4th at ___, 2026 WL 3268397, at *6. As discussed above, that premise is dubious. But it is also irrelevant: when "the Federal Government has an obligation," an order that "prevents" it "from using the program it believes is best suited to the task" of fulfilling that obligation inflicts irreparable harm. *Dep't of Homeland Sec. v. League of Women Voters*, 609 U.S. ___, 2026 WL 2879700, at *3 (U.S. Sept. 25, 2026) (per curiam). That is exactly the case here: federal law makes it unlawful for an alien to vote in a federal election. And Article II obliges the President (through his subordinates) to "take Care" that this prohibition "be faithfully executed." U.S. Const. art. II, § 3; *see Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 367 (2025) ("The Constitution charges the Executive Branch with enforcing federal law."). The injunction inflicts irreparable harm by preventing the Executive Branch

from using the mechanism—namely, field operations and interviews—that it deems best suited to that task. *Cf. Jett v. Castaneda*, 578 F.2d 842, 845 (9th Cir. 1978) ("[T]he investigation of crime is primarily an executive function.").

But even leaving the separation-of-powers and law-enforcement harms aside, the injunction undercuts the government's attempts to deter voter fraud. *See Crawford*, 553 U.S. at 196 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). Congress passed section 611 precisely to deter ineligible non-citizens from voting. *Cf. Sherman v. United States*, 356 U.S. 369, 372 (1958) ("The function of law enforcement is the prevention of crime and the apprehension of criminals."). When courts prohibit investigations by judicial fiat, that deterrent effect evaporates. And once an unlawful vote has been cast, there is no way to unring the bell: "the postelection system of judicial review . . . generally cannot restore the state of affairs before an election." *Republican Party of Pa. v. Degraffenreid*, 592 U.S. 1287, 1294 (2021) (Thomas, J., dissenting from the denial of certiorari).

The district court discounted the government's interest by casting doubt on the threat of voter fraud. But that misses the point twice over. *First*, even the appearance of impropriety—here, voter fraud—undermines public confidence in elections. *See id. Second*, even if past elections have been free from fraud, *but see*

*Crawford*, 553 U.S. at 195–96, those elections were not conducted under the shadow of a court order prohibiting the government from investigating fraud.

The injunction's short time frame—now until the polls close on Tuesday—does not erase the harm. What matters is not the duration of the harm but its irreparability—that is, whether the government can secure an "adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("The [Supreme] Court has repeatedly held that the basis for injunctive relief in federal courts has always been irreparable injury and the inadequacy of legal remedies."). For that reason, even short-lived harms can be irreparable. *See, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("The loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury." (emphasis added) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))); *Carroll v. President of Princess Anne*, 393 U.S. 175, 184 (1968) ("The issuance of an injunction which aborts a scheduled rally or public meeting, *even if the restraint is of short duration*, is a matter of importance and consequence . . . ." (emphasis added)); *Thakur v. Trump*, 176 F.4th 1187, 1205 (9th Cir. 2026); *Am. Encore v. Fontes*, 152 F.4th 1097, 1120 (9th Cir. 2025). Indeed, requiring harms to be of sufficient duration to be

irreparable would defeat every application for a stay pending appeal, since no irreparable harm would occur in the brief period before the resolution of the appeal.

Troublingly, the panel also relies on the government's "questionable timing in pursuing a 'surge' in voter fraud enforcement operations." *Cal. Nurses Ass'n II*, ___ F.4th at ___, 2026 WL 3268397, at *7. It is unclear why the panel felt so free to question the Executive Branch's enforcement priorities. *But see TransUnion*, 594 U.S. at 429 ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch[.]"). But in any event, there is nothing questionable about the timing of the surge. "[T]he Executive Branch . . . invariably lacks the resources to arrest and prosecute every violator of every law," *United States v. Texas*, 599 U.S. 670, 680 (2023), so it makes sense to focus voter-fraud enforcement when its deterrent effect is most urgently needed: around an election. In any event, the panel's timing argument proves too much. The panel faults the government for not "aggressively pursu[ing] its campaign against non-citizen voting well before these elections commenced." *Cal. Nurses Ass'n II*, ___ F.4th at ___, 2026 WL 3268397, at *7. But nearly every government program could have been adopted at an earlier point in time. Yet the Supreme Court has consistently treated judicial interference with such programs as irreparable harm. *See Vasquez Perdomo*, 606 U.S. at 1030 (Kavanaugh, J., concurring) ("As the Court has indicated, any time that the

government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Nor does the government's four-day delay in seeking a stay undercut its irreparable harm. True, the Supreme Court has on occasion treated "abusive delay" as a ground for denying equitable relief. *See Gomez v. U.S. Dist. Ct.*, 503 U.S. 653, 654 (1992) (per curiam). But it has done so only in the face of "obvious attempt[s] at manipulation." *Id.* ("This claim could have been brought more than a decade ago."). No proof of manipulation has been presented here. In *King*, the State delayed seeking a stay for eight weeks—far more than the four days at issue here. 567 U.S. at 1303. Nevertheless, irreparable harm was present based on the same sort of law-enforcement-related harm at issue here. *See id.* Under *King*, it is hard to see how a four-day delay should disqualify the government from seeking a stay.

B.

Finally, "the balance of equities does not counsel against awarding the Government interim relief." *CASA*, 606 U.S. at 860. The injunction inflicts significant and irreparable harm on the government by improperly intruding on the operations of the Executive Branch, preventing the government from enforcing a federal statute, and undermining attempts to prevent voter fraud. On the other side of the ledger, Plaintiffs' alleged harms are tenuous and speculative. *Cf. California*, 609 U.S. at 1032 (holding that the balance of equities supported a stay for the same

reasons "why [the] suit was not justiciable in the first place"). "These harms and equities are not nearly in equipoise." *Nat'l Park Serv.*, 609 U.S. at 1075.

V.

The many errors in this case warranted en banc review. The district court allowed abstract fear to substitute for concrete injury. It invented a right of action where Congress supplied none. It equated investigation with intimidation. And it remedied the supposed intimidation with an impermissibly broad and impenetrably vague injunction. In doing so, the district court subverted basic principles of our constitutional order and our criminal-justice system. And in refusing to grant a stay of the district court's preliminary injunction, the panel did too.

Those errors are serious. We should have gone en banc to correct them. Because we refuse, I respectfully dissent.